**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

TOMMY J. WINSTON )
)
Plaintiff, )
)
v. )
) Civil Action No. 07-1411 (RWR)
CRISTIÁN SAMPER, )
Acting Secretary )
Smithsonian Institution )
)
Defendant**.** )
)

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Plaintiff Tommy J. Winston ("Plaintiff"), by and through his undersigned counsel,

Sundeep Hora, files this Memorandum in Opposition to Defendant Cristián Samper, the

Acting Secretary for the Smithsonian Institution ("Defendant" or "Agency"), Motion to

Dismiss and/or Motion for Summary Judgment (hereinafter "Motion"). For the reasons

set forth below, Defendant's Motion should be denied.

## I.    INTRODUCTION

Tommy Winston has been a hardworking and well-regarded employee of the

Smithsonian Institution for the last twelve years. He has developed a reputation for

having an honest, straightforward, "roll up your sleeves" work ethic and a natural ability

to energize those around him to get the job done and done well. Mr. Winston's entire

career, including the past twelve years with the Agency, has been absolutely flawless. He

has <u>never</u> been subject to discipline during his twelve years at the Agency, nor has he

faced any type of disciplinary action by any employer (including the military) in his

<u>entire</u> career. All of his hard work, the accolades he has received, his continual

advancement and promotions, has been rendered absolutely meaningless by recent actions by the Agency.

After being accused of threatening a co-worker with violence in the workplace, Mr. Winston was stripped of his duties and temporarily reassigned from his position as Facility Management Specialist in the East Mall Zone in Washington, DC to an office in Suitland, Maryland. Mr. Winston was issued a Proposal to Suspend (the "Proposal") by his first -line supervisor, David Samec, and then a Decision on the Proposal to Suspend (the "Decision"), by his second-line supervisor, Nancy Bechtol. Even though the Decision rescinded the proposed suspension and resulted in the issuance of a confirmation of counseling, the Decision made permanent Plaintiff's transfer to Suitland with no hope of ever being restored to the position he held prior to the allegation that he threatened violence. To date, Mr. Winston remains in Suitland with a completely different position and under a series that, unlike his prior position, has no career ladder promotion potential. Mr. Winston timely contacted an EEO Counselor within 45 days after he was issued the Decision. Had he contacted the EEO counselor prior to this date, his Complaint would have been premature and dismissed for alleging a discriminatory act that amounted to a preliminary personnel action—a personnel action that did not become final until after he received Ms. Bechtol's Decision.

Rather than dwell on the fact that he was subjected to discrimination and disparate treatment resulting from his forced reassignment, Mr. Winston did the equivalent of making lemonade out of lemons. In other words, in the manner in which he conducted himself in the EMZ, Mr. Winston brought the same level of dedication and enthusiasm to his position in the Suitland Zone. The Agency, however, chose not to leave Mr. Winston

alone even after they banished him to Suitland, Maryland.  Instead, the Agency subjected Plaintiff to a hostile environment and retaliated against him for engaging in protected activity when it suspending him for seven days without pay based on fabricated allegations of misconduct.

As demonstrated below, Defendant's Motion should be denied because Plaintiff timely exhausted his administrative remedies with respect to Count I, states a *prima facie* claim of retaliation with respect to Count II, and a valid claim for hostile work environment with respect to Count III of the First Amended Complaint.

## II.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

As discussed *infra*, the Agency moves for dismissal pursuant to Fed. R. Civ. P. 12(b)(1) with respect to Plaintiff's discrimination claim (Count I).  Accordingly, because the Court is permitted to look beyond the pleadings (without converting Defendant's motion to dismiss to a motion for summary judgment) in determining its subject matter jurisdiction, Plaintiff discusses background facts and supporting documents that may not be explicitly referenced in the First Amended Complaint.  With respect to the portion of Defendant's Motion brought pursuant to Fed. R. Civ. P. 12(b)(6) (Count III-Hostile Work Environment) and Rule 56 (Count II-Retaliation), Plaintiff strictly adheres to statement of Background Facts contained in the First Amended Complaint.

### A.    Background Facts to Count I (Discrimination Based on Race & Color)

Plaintiff offers the following timeline of relevant events leading up to his reassignment from the East Mall Zone in Washington, DC to Suitland, Maryland, his timely contact with the EEO counselor and the filing of his formal complaint that led to this action.

1.      On **January 3, 2006**, Complainant's supervisor, David Samec, asked Mr. Winston to take over the day-to-day operations for maintenance at the East Mall Zone as the new Facility Maintenance Manager. Exh. A, 1/18/06 Email from Samec to Winston and Gastright ("Tommy is now running the day to day maintenance…"); Exh. A, 2/15/06 Winston Reply to Proposal to Suspend at 3.  This new position required that the Crafts and Utilities shops be brought under Mr. Winston's supervision and that certain responsibilities, including budget and personnel, be taken away from Kendra Gastright and Jeff Ridgeway, both of who were Museum Building Managers.  Specifically, Ms. Gastright's supervisory role over HVAC personnel and managing the maintenance budget for the National Air & Space Museum (NASM) were now assigned to Mr. Winston as the Facility Maintenance Manager.  Exh. A.

2.      On **January 11, 2006**, as part of his transition into his new role, Mr. Winston held a "town hall" type meeting with the utility service repair operators and craft personnel in the National Museum of the American Indian.  During this meeting, Mr. Winston told the group (approximately 23 personnel) about his goals for the EMZ, that he wanted it look and feel like it was one unified zone, and that he was going to build off of the strong foundation developed by Jeff Ridgeway and Kendra Gastright.  Exh. G, 2/15/06 Winston Reply to Proposal to Suspend at 3.  The purpose of the meeting was to energize his new team so that they could approach the significant tasks ahead of them with purpose and the right attitude.  *Id*. at 4.

3.      Two days later, on **January 13, 2006**, Ms. Gastright approached Mr. Winston and asked that he stop by her office to discuss his new role with her.  *It is during this meeting that David Samec, Plaintiff's first line supervisor, informs Mr. Winston that Ms.*

*Gastright accused him of threatening her with violence.*  Mr. Winston complied and went to her office approximately twenty minutes later, at around 10:00 A.M.  Ms. Gastright asked Mr. Winston to close the door and sit down so they could talk.  Id. at 1-2.  Ms. Gastright began discussing how the two of them have different management styles and that she sometimes felt it was difficult to work with him.  Id.  The two of them spoke for approximately an hour during which they were open about their respective management styles and each other's strengths and weaknesses. They also discussed how they could resolve their differences.  The discussion concluded with a commitment by both Ms. Gastright and Mr. Winston to work together more effectively and to "get the job done" in the EMZ.  Id.  At no time did Mr. Winston raise his voice, use inappropriate or threatening language or threaten Ms. Gastright.  Both parties shook hands and Mr. Winston left her office.

4.      *Later that same day*, after Ms. Gastright picked up her son from daycare and brought him back to the office, she, her son, and the Assistant Building Manager, Gary Houston, were in Mr. Winston's office.  The topic of conversation with the group, including Ms. Gastright and her son, was Martin Luther King as the following Monday was Martin Luther King Day.

5.      *Six days later*, on **Thursday, January 19, 2006**, Mr. Samec approached Mr. Winston and informed him that Ms. Gastright had informed him that Mr. Winston had threatened her during their January 13, 2006 meeting.  Exh. G.  Mr. Samec also stated that Ms. Gastright was planning on filing a charge of violence in the workplace against Mr. Winston.  Later that day, Mr. Samec ordered Mr. Winston to remove all of his belongings to the American Indian Museum across the street.  Mr. Winston was also told

not to enter the NASM building, even as a tourist, or attend any meetings at which

Kendra Gastright may be present.  Exh. C.

6.      *Later that day*, on **January 19, 2006**, Samec sent Winston an email to reiterate

his instructions.  His email, in its entirety is as follows:

> Tommy,
>
> To restate what I am requesting you to do ***effective 0001 hours on January 20 (Friday)***:
>
> 1.      Report to work at [the National Museum of the American Indian (NMAI)].  You are now hooked upon on PC in the Crafts Office.  Send me an email once you are on-line and let me know the phone extension at your desk.  Jeff and Kathleen can help you with getting support from NMAI IT or OCIO.
>
> 2.      ***Until further notice***, do not enter the [National Air and Space Museum (NASM)] building.
>
> 3.      Also, ***do not attend meetings where Kendra Gastright may be present.***  Ask me if you think that she may be at a meeting that you need to be at.  Please send Ed Tyson or Robert Lane to meetings on your behalf, such as the EMZ staff meetings.
>
> 4.      ***Continue to equally support the maintenance issues in both museums, NMAI and NASM, to the best of your ability, given these constraints that I have placed upon you***.
>
> ***I anticipate being able to provide you any changes to the requests that I have stated above once I have finished investigating this issue in a few working days.***
>
> Vr,
>
> Dave

Exh. C (emphasis added).

7.      Per Mr. Samec's instructions, on Friday, **January 20, 2006**, Mr. Winston, packed up his belongings from his office at the NASM and moved across the street to an office in the NMAI.

8.      On the following **Monday, January 23, 2006,** Samec issued a memorandum to Mr. Winston that stated:

> Effective January 24, 2006, you are being reassigned to Suitland Zone as Facility Management Specialist, GS-1640.  You will report to Maurice Evans at 7:30 am at the MSC Building, Room 1604…
>
> Your ***initial assignment*** in the Suitland Zone will be ***under your current Position Description*** of Facility Management Specialist…
>
> I remind you in your transfer to Suitland Zone to ***not enter the National Air & Space Museum.  Moving to Suitland should relieve your need to park at NASM.***

Exh. B (emphasis added).

9.      Mr. Samec's memorandum did not provide an explanation as to why Mr. Winston was being reassigned, but it did reiterate Samec's instructions to Winston contained in Samec's January 19th email that Winston was not to enter the NASM building which was where Ms. Gastright's office was located.

10.     On February 3, 2006, Mr. Winston was asked to attend a safety class in which both Ms. Gastright and Mr. Samec were present.  Given Mr. Samec's clear instructions that he was not be in the same building, let alone the same room as Ms. Gastright, Mr. Winston was confused as to why he was permitted to attend the February 3rd safety meeting.  This prompted Mr. Winston to send an email to Mr. Samec inquiring as to the status of his investigation.  In this email, Mr. Winston wrote,

> Dave,
>
> ***Would you please share with me on [sic] the status of my investigation?*** [In your] e-mail dated 19 January 2006, you stated that you will 'have finished investigating this issue in a few working days.' ***It has been over two weeks since you moved me out of the East Zone and ordered me not to enter into National Air and Space Musem (NASM)***
>
> …
>
> ***I would like to know what I have been formally charged with that warrants me not to be able to enter into a Smithsonian's museum (NASM) during operational and non-operational times***
>
> …
>
> I am very concern[ed] about this investigation and ***anxious to clear my good name for any wrongdoing that I may be formally charge[d] with***…."

Exh. D (2/6/06 Email from Winston to Samec).

Ms. Bechtol was copied on this email. In response, Mr. Samec indicated that his investigation was complete and that he would discuss his findings when they met the next day. Exh. E (2/6/06 Email from Samec to Winston)

11. Samec and Winston met the next day on **February 7, 2006** at which time Samec handed Mr. Winston a memorandum entitled "Proposal to Suspend." Exh. F (2/7/06 Proposal to Suspend). The memorandum proposed to suspend Mr. Winston for one day without pay for misconduct arising out of Mr. Winston's January 13, 2006 meeting with Ms. Gastright. Specifically, Mr. Winston was charged with acting "inappropriately and unprofessionally" because he never agreed to comply with Ms. Gastright's request that he stop responding to her sarcastically and teasing her. Mr. Samec wrote:

> When I asked you about your meeting with Ms. Gastright, you stated that nothing happened. I do not believe that "nothing happened," as I have no reason to believe that Ms. Gastright would make up such a detailed story if it were not true. **Instead, I believe that you conducted yourself inappropriately and unprofessionally in your meeting with Ms. Gastright, and that your conduct was disruptive to the work environment.** Further,

your refusal to stop teasing and belittling Ms. Gastright both privately and occasionally publicly is disrespectful and will not be tolerated. The Smithsonian and I must be able to rely on you, as we rely on all employees to conduct yourself professionally in all work-related situations without causing disruption.

In proposing this action, I have considered your ten years of service with the Smithsonian and your generally satisfactory performance. I have also considered your lack of previous discipline. However, I find your misconduct to be so serious that it warrants a one-day suspension.

I warn you that it is your personal responsibility to prevent any recurrence of misconduct, and advise you that more serious disciplinary action will very likely result from such a recurrence, up to and including removal.

Exh. F (2/7/06 Proposal to Suspend).

12.    The February 7, 2006 memorandum did not mention the allegation that Mr. Winston threatened Ms. Gastright with violence, nor did it discuss when or how Mr. Winston would be restored to his former position. There was no indication in the memorandum of Mr. Winston's EEO rights or how he should or could appeal this action through the EEO process. It only stated that he had the right to present a written and/or oral reply to the proposal to the deciding official, Nancy Bechtol, "within 10 calendar days after you receive this notice." Exh. F at 2.

13.    Eight days after receiving the Proposal to Suspend, on **February 15, 2006**, Mr. Winston submitted his Reply to the Proposal to Suspend to Ms. Bechtol. Exh. G. In the Reply, Mr. Winston reiterated his conversation with Ms. Gastright on January 13, 2006 and how he felt that while they disagreed on some issues, it was a productive meeting that ended with a handshake. He also offered evidence that Ms. Gastright made statements to her colleagues that "she did not know why [Samec] was saying bad things

about Tommy" and that she told Samec that "Tommy did not do anything to her."  She

also told her colleagues that Samec escalated the situation out of proportion and that "she

did not want [Mr. Winston] moved."  Id. at 2.

14.    With respect to the proposed suspension and reassignment, Mr. Winston asks Ms.

Bechtol in his Reply to explain the basis for not permitting him to enter the NASM and

for his reassignment when there were no indication in the Proposal to Suspend regarding

purported threats of violence:

> Mr. Samec is directing me to stay out of NASM and there are no
> formal charges filed against me for violence in the workplace
> anywhere in the Smithsonian Institution.  *I have asked Mr. Samec
> in an email dated February 6, 2006 and when he issued my
> proposal to suspend memo on February 7, 2006,* **what have I been
> formally charged with that warrants me not to be able to enter
> into the NASM?  Mr. Samec refuses to answer this question**.
> **Mr. Samec has reassigned me to another zone because of the
> allegations that he said are against me.**  *Now he wants to
> suspend me for one day.  To be removed out of the zone, then to be
> suspended for one day without pay for the same incident (an
> incident that I am innocent) is "double jeopardy" in legal terms*.

Id. at 4.

15.    Mr. Winston submitted his Reply as an attachment in an email to Ms. Bechtol

wherein he wrote, "I would like to formally send you my written reply and request a

meeting with you at your convenience."  Exh. H (2/15/06 Email from Winston to

Bechtol).

16.    Four days later, on **February 19, 2006**, Ms. Bechtol responded to Mr. Winston's

request for a meeting, "Thanks Tommy, and yes I would like to meet with you next week

sometime…Let me email you first of next week so we can find a good time.  I will get

back to you shortly."  Exh. H (2/19/06 Email from Bechtol to Winston).

17.    Ms. Bechtol never followed up with Mr. Winston as she said she would in her February 19, 2006 email.

18.    After not hearing from Ms. Bechtol for several weeks, Mr. Winston sent a follow-up email on **March 21, 2006** stating, "I am respectfully sending this friendly reminder to you so we can bring some closure to this situation.  I am very concern[ed] about this investigation and anxious to clear my good name *for any wrongdoing that I may be formally charge[d] with*.  I still believe that the truth has not surfaced and that *my rights were and still are being violated.  I would like to pursue that issue once I am exonerated from the current allegations of violence in the workplace charges*…"  Id. (3/21/06 Email from Winston to Bechtol).

19.    In her response to Mr. Winston the same day, Ms. Bechtol wrote, "*So sorry about being so slow getting back to you on this important issue.*  I would like to meet with you soon and wonder if you have some time this Thursday or Friday afternoon?...I have cc'd Melanie [Engelen] as I would like her to sit in with me when we discuss this case."  Id. (3/21/06 Email from Bechtol to Winston).

20.    Mr. Winston met with Ms. Bechtol and Ms. Englen on **March 23, 2006**.

21.    On **April 3, 2006**, **Fifty-five (55) days** after Samec issued the Proposal to Suspend and forty-seven (47) days after Mr. Winston submitted his Reply to the Proposal, Ms. Bechtol issued her Decision on the Proposal to Suspend in a memorandum dated March 27, 2006.  In the Decision, Ms. Bechtol wrote, in relevant part:

> [Y]ou denied belittling Ms. Gastright or making any threats.  You wrote that it was a very productive meeting and you agreed to make some changes on how you conduct business and you shook hands.

> In addition, ***you wrote that you were told that you were being investigated for violence in the workplace, but the proposal to suspend does not mention violence in the workplace.*** <u>***You also wrote that you were reassigned to another zone because of an allegation that was made against you related to violence in the workplace.***</u>
>
> …
>
> ***I have also considered whether you were charged with violence in the workplace.*** In reviewing the proposal and information in the case file, ***I do not find that you were charged with any violence in the workplace or making any threats. In fact, the proposal did not mention any allegations of threatening behavior.*** I have also considered the fact that, by your own admission, you explained that you and Ms. Gastright both have "tones" in your voice, and that although you use a "tone," you are not malicious. Based on the facts that I have available to me, I have decided to rescind the proposal to suspend you. Instead, I will issue a confirmation of counseling.
>
> …
>
> I warn you that it is your personal responsibility to prevent any recurrence of misconduct and ***advise you that more serious disciplinary action will very likely result from such a recurrence, up to and including removal.***
>
> <u>***My decision to counsel you is final.***</u>

Exh. I (emphasis added).

22.    In her Decision, Ms. Bechtol acknowledged that Mr. Winston believed that his reassignment to Suitland was based on the allegation of threatened violence in the workplace, however, she did not take the opportunity to explain the reassignment or to correct Mr. Winston's belief if he was under a misapprehension. More importantly, she did not rescind his reassignment from the EMZ to Suitland.

23.    Shortly after receiving Ms. Bechtol's Decision, Mr. Winston retained counsel and initiated contact with an EEO counselor on April 27, 2006—24 days after receiving Ms. Bechtol's Decision on the Proposal to Suspend.

24.    In June of 2006, Mr. Winston finally stopped making payments on his parking spot at the EMZ as it was finally clear to him that he would not be restored to his prior position at the EMZ.

**B.    Background Facts to Count II (Retaliation) and Count III (Hostile Environment)**

25.    After being transferred to the Suitland Zone, also known by SI employees as the "Black Zone" for its predominantly African-American workforce, Plaintiff's first line supervisor became Maurice Evans, Suitland Zone Manager.  Mr. Evans reports directly to Nancy Bechtol who remained Plaintiff's second line supervisor.  First Amended Complaint (Compl.) at ¶ 31.

26.    At a weekly managers' meeting on February 6, 2007, Evans, discussed the snow removal plan for the next day, February 7, 2007.  Mr. Evans put James Cutler and David Sidbury in charge of snow removal and asked them about their plan and whom they were going to bring in to help with the snow removal effort.  Mr. Sidbury informed Mr. Evans that he wanted Oscar Waters, a WG-10, to be on his snow removal team.  Mr. Cutler informed Mr. Evans that he wanted James Taylor, Maintenance Mechanic, also a WG-10, to assist.  Compl. at ¶ 32.

27.    Mr. Evans instructed Mr. Cutler that Mr. Taylor would be permitted to assist.  Mr. Evans further stated that only one WG-10 would be permitted to assist with snow removal; therefore, Oscar Waters was not permitted to participate if Taylor was present.  Compl. at ¶ 33.

28.    Contrary to Mr. Evans' directive, on February 7, 2007, Mr. Sidbury, without Plaintiff's knowledge or approval, called Mr. Waters in to help with the snow removal detail.  Mr. Sidbury's apparent justification for calling Mr. Waters to request that he

come in was because the other members of the team he assembled did not show up and

he needed Mr. Sidbury to ensure adequate coverage. <u>Id</u>. at ¶ 33.

29.    Mr. Sidbury was present at the February 6, 2007 meeting wherein Evans indicated

that Waters was not authorized to come in for snow removal. Mr. Waters would not have

come in but for Mr. Sidbury contacting him the morning of February 7, 2007 to order him

to participate in the snow removal effort.  Compl. at ¶ 34.

30.    Later in the day on February 7, 2007, Mr. Cutler sent an email to Mr. Evans

informing him that "Oh! Very good snow removal this morning by BSW Phillip and

Sidbury Crew.  All look[sic] very good."  Mr. Evans' only response to this

communication was, "Was Oscar there[?]"  Compl. at ¶ 35.

31.    On or about February 28, 2007, Evans issued Plaintiff, not Mr. Sidbury, a

Proposal to Suspend for seven days without pay for (1) failure to inform Oscar Waters

not to report for snow removal detail on February 7, 2007; and (2) allegedly abusing

Plaintiff's SI issued cell phone. Compl. at ¶ 36.

32.    When Mr. Evans handed Plaintiff the Proposal to Suspend, he said, "You know

you don't have any friends downtown." Compl. at ¶ 36.

33.    A week after receiving the Proposal to Suspend, March 7, 2007, Smithsonian

Employees received the following email from Smithsonian's Business Operations:

> Business Operations **is working on developing guidelines** on cell
> phone use and/or abuse which will have to be signed by every
> employee that has a cell phone.  The phone bills are being put under
> the microscope and anyone's who's abusing their phone usage will be
> receiving a phone call from Business Operations asking them to please
> use phones for official SI business only.  With the exception of some
> personal calls from time to time.  **We are working to set monthly cell
> phone limitations**.

Compl. at ¶ 37.  In sum, Plaintiff was issued a Proposal to Suspend for allegedly abusing his SI issued cell phone a week prior to receiving an email from Business Operations that they were in the process of "developing guidelines on cell phone use and/or abuse" and "working to set monthly cell phone limitations." Compl. at ¶ 38.

34.    When Mr. Evans handed Plaintiff the Proposal to Suspend on February 28, 2007, Plaintiff asked him whether anyone else was being disciplined for overusing his or her cell phone.  He responded, "Now if you go and pull everyone's records, everyone is going to know that it is you who did it, and then we are going to have to put a policy in place and everyone will know it is because of you."  He then repeated, "this is coming from downtown, and you and I have talked about the fact that you know you don't have any friends from downtown." Compl. at ¶ 39.

35.    Without being asked, Plaintiff surrendered his SI cell phone to Mr. Evans.  Mr. Evans refused to take the phone and directed Plaintiff to keep it.  Compl. at ¶ 40.

36.    On March 27, 2007, Plaintiff, through counsel, responded to Evan's Proposal to Suspend in a letter addressed to Nancy Bechtol, the Deciding Official.

37.    On April 24, 2007, Nancy Bechtol issued her decision to suspend Plaintiff for seven days without pay. Compl. at ¶ 42.

38.    Plaintiff served his suspension without pay from May 6, 2007 to May 12, 2007. Compl. at ¶ 44.

39.    Mr. Winston filed a formal complaint of discrimination on May 11, 2007. Plaintiff received the Final Agency Decision on or about September 28, 2007 and amended his pending complaint with this Court prior to Defendant filing an Answer or responsive pleading.

## II.    <u>LEGAL STANDARDS</u>

The Agency's Motion is improperly styled as only a Motion to Dismiss because while the Agency appears to move for dismissal under to Fed. R. Civ. P. 12(b)(1) with respect to Count I (Discrimination Based on Race and Color) and Fed. R. Civ. P. 12(b)(6) with respect to Count III (Hostile Environment), the Agency argues that summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate with respect to Count II (Retaliation) of the First Amended Complaint.  Accordingly, each of the applicable legal standards is discussed below.

### A.    <u>MOTION TO DISMISS</u>

#### 1.    **Fed. R. Civ. P.  12(b)(1)**

In resolving motion to dismiss for lack of subject matter jurisdiction that attacks complaint on its facts, court is not confined to face of pleadings and may properly consider matters such as affidavits and other material properly before court without converting the motion into a summary judgment motion.  Fed. Rules Civ. P. R. 12(b)(1); <u>Courtney v. Choplin</u>, 195 F. Supp.2d 649 (D.N.J. 2002); <u>Enzo Therapeutics, Inc. v. Yeda Research & Dev. Co. of the Weizmann Inst. of Science</u>, 467 F. Supp.2d 579 (E.D. Va. 2006); Sizova v. Nat'l Inst. Of Standards & Technology, 282 F.3d 1320 (10th Cir. 2002) (reliance on evidence outside the pleadings in addressing a motion to dismiss for lack of subject matter jurisdiction does not convert the motion to one for summary judgment.).

In determining whether the court has subject matter jurisdiction, it must "afford the nonmoving party an ample opportunity to secure and present evidence relevant to the existence of jurisdiction."  <u>Prakash v. American Univ.</u>, 727 F.2d 1174, 1179-1180 (D.C. Cir. 1984).  This includes giving the "plaintiff an opportunity for discovery and for a

hearing that is appropriate to the nature of the motion to dismiss." Id. at 1180 n.41

(citation omitted). See also, See Harms v. I.R.S., 146 F. Supp. 2d 1128 (D. Kan. 2001)

(When reviewing factual attack on subject matter jurisdiction, district court may use its

discretion and hold a limited evidentiary hearing to resolve disputed jurisdictional facts.).

In particular, when issues of credibility are concerned, the court cannot rest its decision

simply on the paper record, but is required to hold an evidentiary hearing. Prakash, 727

F.2d at 1180.

### 2. Fed. R. Civ. P. 12(b)(6)

A court has limited discretion to grant a motion to dismiss for failure to state a

claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Christensen v.

Quigley Mem. Hosp., 656 F. Supp. 14, 16 (D. Mass 1985).

In ruling on a motion to dismiss for failure to state a claim, it must be recalled that

the purpose of a 12(b)(6) motion is to test the sufficiency of the complaint, not to decide

the merits of the action. Schatz v. Rosenberg, 943 F.2d 485, 489 (4th Cir.1991); Food

Lion, Inc. v. Capital Cities/ABC, Inc., 887 F.Supp. 811, 813 (M.D.N.C.1995). To satisfy

the pleading requirements for a claim under Title VII, a plaintiff's complaint must

comply with Rule 8 of the Federal Rules of Civil Procedure and therefore "must simply

contain 'a short and plain statement of the claim showing that the pleader is entitled to

relief.'" Hopkins v. Women's Div., Gen. Bd. of Global Ministries, the United Methodist

Church, et al., 238 F. Supp. 2d 174, 181 (D.D.C. 2002) (citations omitted).

"[A] Complaint should not be dismissed for failure to state a claim unless it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim

which would entitle him to relief." Conley v Gibson, 355 U.S. 41, 45-46, (1957). In

deciding a motion to dismiss, a court must "consider only the facts and allegations set forth in the complaint and must view them in a light most favorable to the plaintiff." Harper v. Cserr, 544 F.2d 1121, 1122 (1st Cir. 1976).  The Court must grant the plaintiff the benefit of all inferences that can be derived from the alleged facts.  Conley, 355 U.S. at 45-46.

The issue is not whether the plaintiff will ultimately prevail on his claim, but whether he is entitled to offer evidence to support the claim. See, e.g., Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), overruled on other grounds by Davis v. Scherer, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984).  A plaintiff need not plead detailed evidentiary facts, and a complaint is sufficient if it will give a defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. See Bolding v. Holshouser, 575 F.2d 461, 464 (4th Cir.1978).

## B.    SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Summary judgment should seldom be used in employment discrimination cases. See Fennel v. First Step Designs, 83 F.3d 526, 535 (1st Cir. 1996) (summary judgment appropriate in cases where motive or intent are at issue only if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation); Crawford v. Runyan, 37 F.3d 1338, 1341 (8th Cir. 1994) ("discrimination

cases often depend on inferences rather than on direct evidence, summary judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant"), relying on <u>Hillebrand v. M-Tron Industries, Inc</u>., 827 F.2d 363, 364 (8th Cir. 1987), cert. denied, 488 U.S. 1004, 109 S. Ct. 782 (1989); <u>see</u> <u>also</u>, <u>Perdomo v. Browner</u>, 67 F.3d 140 (7th Cir. 1995) (Summary judgment standard applied with added rigor in employment discrimination cases).

A Court deciding a Motion for Summary Judgment must view the evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in his favor. <u>Reeves v. Sanderson Plumbing Prods</u>., 530 U.S. 133, 150-52, 120 S. Ct. 2097 (2000). "A district court may grant summary judgment only if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Waterhouse v. District of Columbia</u>, 298 F.3d 989 (D.C. Cir. 2002) (internal citations omitted).

In considering a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Anderson v. Liberty Lobby, Inc</u>., 477 U.S. 242, 249, 106 S. Ct. 2505 (1986). The court must determine, "not whether [it] thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the nonmoving party on the evidence presented." <u>Id</u>. at 252.

## III.    ARGUMENT

### A.    PLAINTIFF TIMELY EXHAUSTED HIS ADMINSTRATIVE REMEDIES WITH RESPECT TO COUNT I OF THE FIRST AMENDED COMPLAINT (RACE AND COLOR DISCRIMINATION)

#### 1.    Effective Date of Personnel Action was Date that Bechtol issued Her Decision on Proposal Because that is the Date the Temporary Reassignment Became Final.

29 CFR § 1614.107(a)(2) requires that a federal employee initiate contact with an Equal Employment Opportunity (EEO) Counselor within 45 days of the date of the matter alleged to be discriminatory, or, in the case of a personnel action, within 45 days of the *effective date of the action*.  Ms. Bechtol's Decision on the Proposal to suspend is the discriminatory matter complained of as well as the effective date of Mr. Winston's reassignment from the East Mall Zone (EMZ) in Washington, DC to the Suitland Zone in Suitland, Maryland.

The Effective Date of Mr. Winston's reassignment is the date it became permanent, which is the date of Ms. Bechtol's Decision on the Proposal to Suspend.  See Jeffers v. Thompson,  264 F. Supp.2d 314, 329 -330 (D.Md. 2003) (holding that a while a suspension from pay and duty clearly amounts to an actionable claim, just as clearly, a proposed suspension that is never carried out does not); see also, Howze v. Va. Polytechnic, 901 F. Supp. 1091, 1096-97 (W.D.Va.1995) (holding that professor had not suffered an adverse employment action when an intermediate committee denied her tenure, but the ultimate review committee granted it).  Plaintiff was at all times led to believe that he would be restored to his prior position after the investigation exonerated him of the threatened violence allegation. Up to and until the Decision was issued, Mr. Winston's reassignment was only a preliminary or temporary personnel decision that did

not render him aggrieved.  See James v. England, 332 F.Supp.2d 239, 244 (D.D.C. 2004).

Had Plaintiff contacted the EEO Counselor prior to receiving the Decision, the Agency

would likely have move to dismiss pursuant to 29 C.F.R. § 1614.107(a)(5) which requires

dismissal of complaints that allege "that a proposal to take a personnel action, or other

preliminary step to taking a personnel action, is discriminatory."  Jeffers, 264 F. Supp.2d

at 329.

        In James, this court explained, "Although the District of Columbia Circuit has not

exhaustively defined what constitutes an adverse personnel action under Title VII, 'courts

applying Title VII have consistently focused on ultimate employment decision[s] such as

hiring, granting leave, promoting, and compensating…[and not] interlocutory or

intermediate decisions having no immediate effect upon employment decisions.  Id.

(citing Kilpatrick v. Riley, 98 F.Supp.2d 9, 20-21 (D.D.C. 2000).

        Mr. Winston even kept paying for his parking spot at the EMZ until June 2006,

after it became clear that he would not be restored to his prior position.  He timely

contacted an EEO counselor after he learned through Bechtol's Decision that he was not

going to be restored to his former position in the EMZ.  See Williams v. Potter, EEOC

Appeal No. 01A54583 (Sept. 22, 2005) (holding that Complainant timely contacted the

EEO Counselor within 45 days after he learned that he would not be restored back to his

former duty station).  As discussed above, all of the evidence establishes that Mr.

Winston's transfer to Suitland was only temporary and that if he ultimately was

exonerated of any wrongdoing, he would be restored to his former position.  The

Agency's assertion to the contrary is transparent fabrication to avoid using the April 3,

2006 date (the date Bechtol issued the Decision) in computing whether Mr. Winston timely initiated contact with the EEO counselor.

It is undisputed that the only justification the Agency gave Mr. Winston for his transfer to the Suitland Zone was because he was accused of threatening Kendra Gastright with violence and Mr. Samec needed to separate him from her pending resolution of Ms. Gastright's allegation. Mr. Winston was at all times led to believe that if these allegations were proven false, he would be restored to his former position in the EMZ. Samec's investigation led him to issue a Proposal to Suspend Mr. Winston for one day. As this was only a Proposal, Mr. Winston's reassignment was still not permanent. Mr. Winston submitted his rebuttal to the Proposal to Ms. Bechtol who issued her final decision. Only after Ms. Bechtol issued the "Decision on Proposal to Suspend" did Mr. Winston's reassignment to Suitland, Maryland become final and effective for purposes of 29 CFR § 1614.107(a)(2).

In order to avoid litigating Mr. Winston's claims against the Agency, the Agency now conveniently asserts that Mr. Winston's reassignment to Suitland was separate and apart from the allegations of threatened violence. The Agency's sole support for this assertion is use of the term "Effective" in the January 23, 2006 memorandum wherein Mr. Samec wrote, "Effective January 24, 2006, you are being reassigned to Suitland Zone as Facility Management Specialist, GS-1640." Def. Mot. at 7.

The Agency's assertion is both contrary to logic and the evidence. As an initial matter, Samec could just as easily used the term "as of" instead of "effective" in the January 23, 2006 memorandum. More importantly, the sequence of events leading up to the Decision on the Proposal supports only one conclusion that Mr. Winston was

reassigned because of Ms. Gastright's purported allegation, and that should he be

exonerated, he would be permitted to return back to the EMZ.

    1.     **Thursday, January 19, 2006**- Samec approaches Winston and informs him that Gastright made an allegation that he threatened her with violence.  Samec orders Winston to remove all of his belongings and move to an office across the street, not to enter the NASM building (even as a tourist) or attend any meetings where Gastright might be present.

    2.     Later the same day, **Thursday, January 19, 2006**, Samec sends Winston an email reiterating his instructions.  He uses the same terms as in the January 23, 2006 reassignment memorandum when he writes, "Effective 0001 hours on January 20 (Friday)…"  Winston is told "until further notice" not to enter the NASM building, not to "attend meetings where Kendra Gastright might be present.  Winston is also told that his duties have not changed when Samec writes, "continue to equally support the maintenance issues in both museums…to the best of your ability given these constraints that I have placed upon you."  Samec concludes the email with a significant statement: ***I anticipate being able to provide you any changes to the requests that I have stated above once I have finished investigating this issue in a few working days**."  Exh. C.

    3.     Mr. Winston complied with these instructions the next day (Friday) and went home for the weekend.  On **Monday, January 23, 2006**, Samec issues the reassignment memo transferring Winston to the Suitland Zone.  Similar to his instruction to Winston in his January 19, 2006 email, Samec writes, "Your initial assignment in the Suitland Zone ***will be under your current Position Description*** of Facility Management Specialist…"  Samec also reiterates his instruction that Winston is not to "enter the [NASM]."  Exh. B.

Samec's January 19th email to Winston and his January 23rd reassignment

memorandum are virtually identical except for the location in which Plaintiff is required

report to work.  Both the email and the memorandum state that Mr. Winston's duties will

remain the same and he is not to enter the NASM building where Ms. Gastright's office

is located.  There is no justification for the reassignment other than this is part and parcel

with Samec's need to separate Winston from Gastright while he supposedly conducted

his investigation.  The January 23rd reassignment memo is also consistent with Samec's

statement in the January 19th email that he anticipated "being able to provide [Plaintiff]

with any changes to the above…"

Finally, if it truly was the case that Mr. Winston's reassignment was a distinct action that was not dependent on the investigation into Gastright's allegation, the Agency had numerous opportunities to correct Mr. Winston's "misapprehension," but chose to keep Plaintiff in the dark. For example, on February 3, 2006, Plaintiff sent Samec an email (with a copy to Nancy Bechtol) wherein he asks, "Would you please share with me the status of my investigation…It has been over two weeks since you moved me out of the East Zone and ordered me not to enter in the [NASM}…I would like to know what I have been formally charged with…" Exh. D. Plaintiff never received a response from either Ms. Bechtol or Mr. Samec.

Plaintiff then reiterates the same questions in his Reply to the Proposal submitted to Nancy Bechtol wherein he wrote, "I have asked Mr. Samec…what have I been formally charged with that warrants me not to be able to enter into the NASM? **Mr. Samec refuses to answer this question.  Mr. Samec has reassigned met to another zone because of the allegations that he said are against me.**" Exh. G.  Ms. Bechtol could have used this opportunity to correct Mr. Winston if he indeed was under a misapprehension regarding his reassignment.  We can only assume that she and Samec chose not to correct Mr. Winston's assertion because he was indeed correct:  his reassignment to Suitland was contingent upon the results of the investigation into Gastright's allegations.  Mr. Winston was reasonably led to believe that if the allegations were proven false, he would be restored to his former position in the EMZ.

Mr. Winston again reiterates his lack of knowledge about the circumstances leading to his reassignment in his March 21, 2006 email to Bechtol when he writes, "[I am] anxious to clear my good name for any wrong doing that I may be formally

charge[ed] with." Exh. H.  Again, Bechtol chose not to inform Mr. Winson of the specific allegations against him or the basis for his transfer.

On April 3, 2006, Bechtol gave Winston her Decision on the Proposal to Suspend (dated March 27, 2006) where she restated Plaintiff's "misapprehension" about the basis for his reassignment: "You also wrote that you were reassigned to another zone because of an allegation that was made against you  related to violence in the workplace."  Here again, Bechtol did not correct Winston or provide the "true" justification for her transfer. Instead, she merely wrote, "I have also considered whether you were charged with violence in the workplace…I do not find that you were charged with any violence in the workplace or making any threats…" Exh. I.

In sum, the Agency continually and purposefully kept Mr. Winston in the dark about the specific charges against him.  Plaintiff was always led to believe that his reassignment was dependent on the results of Mr. Samec's investigation  and the final Decision on the Proposal by Bechtol.  If Gastright's allegations were shown to be false, he would have been restored to his former position in the EMZ.  Plaintiff therefore timely contacted the EEO Counselor within 45 days of the effective date of his transfer to Suitland.

**2.    In the alternative, Plaintiff did not have actual or constructive notice of the 45-day limit, therefore the Agency was required to extend the 45-day limit.**

29 C.F.R. § 1614.105(a)(2)  provides that the "agency or the [EEOC} shall extend the 45-day time limit…when the individual shows that he or she was not notified of the time limits and was not otherwise aware of them… or for other reasons considered sufficient…."  The mandatory language of subsection (a)(2) means that the Agency

"must grant an extension if the employee shows that he 'was not notified' or 'otherwise aware' of the time limit.   Harris v. Gonzales, 488 F.3d 442, 444 (D.C. Cir. 2007).  Notice can be actual or constructive.  Id.

With respect to actual notice, it is undisputed that Mr. Winston was completely unaware of the requirement that he contact the EEO counselor within 45 days of his initial transfer to Suitland in January 2006.  Exh. J (Winston Aff.) at ¶4.  This is also evidenced by Winston's March 21, 2006 email to Bechtol to remind her that he was awaiting her decision on the Proposal.  Mr. Winston writes, "I am very concerned about this investigation and anxious to clear my good name for any wrongdoing that I may be formally charge[d] with. I still believe that the truth has not surfaced and that my rights were and still are being violated**.  I would like to pursue that issue once I am exonerated from the current allegations of violence in the workplace charges**…" Exh. H.  Mr. Winston's email establishes the state of his knowledge at the time, specifically that he was oblivious as to a time requirement because he believed that he could pursue vindication of his civil rights after he was "exonerated from the current allegations of violence in the workplace…"

With respect to any assertion by the Agency that Plaintiff was provided constructive notice of the time limit, in Harris, the D.C. Circuit Court adopted the Seventh Circuit's test in Johnson v. Runyon, 47 F.3d 911 (7th Cir. 1995) which declined to adopt a strict theory of constructive notice and instead set out a two step inquiry:  (1) whether the notification of the 45 day time requirement was provided, and (2) whether the notification was reasonably geared to inform the complainant of the time limits." Harris, 488 F.3d  at 445.  The Agency cannot meet the first requirement of this analysis.  As Mr. Winston

states in his affidavit, he was never made aware of the 45 day limit, nor were there "any posters, handbooks or other materials that were conspicuously displayed or disseminated to me that contained this information." Exh. J.

Accordingly, because Mr. Winston had neither actual nor constructive notice of the 45-day limit, the Agency was required to extend the time period by which Plaintiff was required to meet with an EEO counselor. 29 C.F.R. § 1614.105(a)(2).

**B.    IN THE ALTERNATIVE, EQUITY DICTATES THAT THE 45 DAY PERIOD SHOULD BE TOLLED**

**1.    The Agency should not be rewarded for keeping Plaintiff unaware of the circumstances surrounding his reassignment, for Samec's delay in tiely investigating Gastright's allegations and for Bechtol taking fifty-five days (55) to issue her Decision on the Proposal to Suspend.**

As the Agency points out in its Motion, the 45-day limit is subject o estoppel and equitable tolling. See <u>Aceto v. England</u>, 328 F.Supp.2d 1, 5 (D.D.C. 2004). Throughout this entire ordeal, Mr. Winston was purposefully kept unaware about the allegations that were made against him to warrant his reassignment and loss of duties. Mr. Winston repeatedly asked in emails to Mr. Samec and Ms. Bechtol and in his reply to the Proposal to Suspend "what am I being charged with?" Until he received the Decision on the Proposal to Suspend on April 3, 2006, Mr. Winston still was under the impression that he was being charged with violence in the workplace.

Mr. Samec informed Mr. Winston of Ms. Gastright's accusations on January 19, 2006. Only after Mr. Winston prompted Mr. Samec about the investigation did he agree to meet with him on February 7, 2006 to give Plaintiff the results of his investigation. On the same date, Mr. Winston received the Proposal to Suspend on February 7, 2006 and timely replied eight days later on February 15, 2006. Ms. Bechtol, by her own admission,

delayed giving him the Decision until April 3, 2006.  See Exh. H, 3/21/06 email from Bechtol to Winston ("So sorry about being so slow getting back to you on this important issue.").  And it was only after Mr. Winston prompted her that she agreed to meet with him.  See Exh. H (3/21/06 Email from Winston to Bechtol) ("I am respectfully sending this friendly reminder to you so we can bring some closure to this situation.  I am very concern[ed] about this investigation and anxious to clear my good name for any wrongdoing that I may be formally charge[d] with.")  It took Bechtol fifty-five (55) days from the date of the Proposal for her to issue her Decision.

The Agency cites March 10, 2006—45 days after he was initially transferred to Suitland—as the date in which Mr. Winston was supposed to contact his EEO counselor. The evidence shows that Mr. Winston was not the type of person to sit on his rights.  He could easily have contacted the EEO counselor by March 10th had Mr. Samec and Ms. Bechtol timely investigated Gastright's allegations and issued the Decision on the Proposal to Suspend respectively.  Accordingly, equity dictates that the Agency should not cause an unreasonable delay that results in a denial of Plaintiff's right to assert his claims in court.

**C.    Court should grant limited discovery and hold an evidentiary hearing to determine the existence of its subject matter jurisdiction.**

Should the court not be persuaded by Plaintiff's factual assertions regarding the timeliness of his contact with the EEO counselor, Plaintiff respectfully requests that he be granted an opportunity to conduct limited discovery to secure and present evidence at a hearing regarding the existence of jurisdiction.  See Prakash v. American Univ., 727 F.2d 1174, 1179-1180 (D.C. Cir. 1984); see also, See Harms v. I.R.S., 146 F. Supp. 2d 1128 (D. Kan. 2001).

**D.    There is No Basis at this Juncture to Grant the Agency's Motion for Summary Judgment with Respect to Count II (Retaliation).**

The Agency asks that this court enter summary judgment in its favor against Plaintiff's retaliation claim.  The Agency's sole basis for summary judgment at this early stage of the litigation is that the "time lapse involved here of ten months is simply insufficient as a matter of law to establish a causal connection between the protected activity and a retaliatory action."  Def. Mot. at 11.

To establish a retaliation claim under Title VII, Plaintiff must show (1) that he engaged in a protected activity, (2) that Defendant was aware of this protected action, (3) that thereafter Defendant took adverse employment action against Plaintiff, and (4) that there was a causal connection between the protected activity and the adverse employment action. Plumb v. Potter, 212 F.App'x 472, 482 (6th Cir.2007).

The Agency cites this court's decision in Brodetski v. Duffey, 199 F.R.D. 14, 19-20 (D.D.C. 2001), wherein the court stated, "A causal connection may be inferred by showing that the employer had knowledge of the employee's protected activity, and that the adverse perssonel action took place shortly after that activity."  (citing Mitchell, 759 F.2d 60, 86 (D.C. Cir. 1985).

The Agency's assertion that there is no causal connection is meritless.  The same person—Nancy Bechtol—who issued the Decision on the Proposal to Suspend regarding Plaintiff's purported misconduct with respect to Ms. Gastright is the same exact person who issued the Decision on the Proposal to Suspend Plaintiff for seven days without pay due to Plaintiff's purported abuse of his cell phone and for failing to prevent Oscar Waters from participating in the snow removal detail.  During the entirety of this case, including the protected activity that gave rise to the claim of retaliation, Nancy Bechtol

has been Plaintiff's second-line supervisor and the Deciding Official in both of the Proposals to Suspend that were issued to Plaintiff. There is absolutely no basis from which the Agency can assert that it did not have knowledge of Plaintiff's protected activity when it instituted the retaliatory action to suspend Plaintiff for seven days.

Moreover, the Agency's temporal causation argument is equally meritless. Plaintiff instituted his claim of discrimination by filing a formal complaint with the Agency's Office of Equal Employment and Minority Affairs (OEEMA) on June 26, 2006. Maurice Evans, Plaintiff's first line supervisor who reports directly to Nancy Bechtol issued the retaliatory Proposal to Suspend Plaintiff for seven days on February 28, 2007—8 months after Mr. Winston filed his formal complaint of discrimination. Nancy Bechtol upheld the Proposal by memorandum dated April 24, 2007—less than ten months after Plaintiff filed his formal complaint of discrimination. This Court has held that an adverse action that follows one year after protected activity is sufficiently close in time to establish a causal nexus. Sullivan v. Catholic Univ. of Am., 387 F. Supp. 2d 11 (D.D.C. 2005) (protected activity that occurred in August 2002 followed by denied promotion in August 2003, deemed sufficient to establish *prima facie* case of retaliation).

Mr. Winston's case is distinguishable from cases cited by the Defendant in its motion, such as Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273-274 (2001) (holding that if the only evidence of causality is the length of time between the protected activity and the adverse action, the length of time between protected activity and a purported act of reprisal must be "very close" in order to be sufficient evidence of causality to establish a prima facie case of reprisal). In Breeden, there was no evidence that the responsible supervisor was aware of the plaintiff's protected activity. Id. at 273

30

("there is no indication that [the responsible supervisor] even knew about the right-to-sue

letter when she proposed transferring respondent").  In this case, Nancy Bechtol was

intimately aware of Mr. Winston's protected activity.  As a result, Mr. Winston can

demonstrate a causal connection between his protected activity and his suspension for

seven days.  Thus, Plaintiff establishes each element of his *prima facie* burden for

reprisal.

**E.    Plaintiff states an actionable claim for Hostile Work Environment.**

The government next attempts to dispose of Mr. Winston's hostile environment

claim by arguing that discrete actions can never be used as the basis of a hostile

environment claim.  The Defendant's assertion is incorrect.  Discrete acts can be used to

support a hostile environment claim so long as the employer's conduct, seen as a whole,

is sufficiently severe or pervasive to change the terms and conditions of employment. *See*

Singletary v. District of Columbia, 351 F.3d 519, 526-28 (D.C. Cir. 2003)

The government argues that, "a claim alleging a hostile working environment is

distinct from a claim alleging a discrete act of discrimination or retaliation." Def's Mot.

at 17.  For this proposition, the Defendant cites Amtrak v. Morgan, 536 U.S. 101, 115

(2002).[1]  This is a plain misuse of the Morgan decision. In Morgan, the Supreme Court

held that an employee must exhaust his or her administrative remedies for each discrete

act of discrimination or retaliation and that the employee could not avoid exhausting

administrative remedies by couching the discrete acts as a hostile environment claim.

Nothing in the opinion holds that discrete cannot form the basis for a hostile environment

---

[1] The government's citation is incorrect as the quoted language appears at page 114 of the
opinion.

31

claim. This becomes is clear upon a full reading of the portion of the decision to which

the Agency cites, which reads:

> Discrete acts such as termination, failure to promote, denial of transfer, or
> refusal to hire are easy to identify. Each incident of discrimination and
> each retaliatory adverse employment decision constitutes a separate
> actionable "unlawful employment practice." *Morgan can only file a*
> *charge to cover discrete acts that "occurred" within the appropriate time*
> *period*.

*Amtrak v. Morgan,* 536 U.S. at 114 (the *added emphasis* marks the all-important

language the Defendant neglected to quote from its Motion).

The government next cites a string of District Court cases, all of which are

distinguishable to the case at bar.

In Rattigan v. Gonzales, 503 F.Supp.2d 56 (D.D.C. 2007), the District Court held

that "discrete acts constituting discrimination or retaliation claims are different in kind

from a hostile work environment claim that must be based on severe and pervasive

discriminatory intimidation or insult." The Plaintiff is mostly in agreement with this

statement, which is taken directly from the portion of the Morgan opinion that requires

discrete acts to be exhausted separately. Morgan, 536 U.S. at 114.  However, Plaintiff

disagrees that in order to constitute a hostile environment, the conduct must be in the

form of "intimidation or insult." Neither the D.C. Circuit, nor the Supreme Court has

limited hostile environment claims in this manner.  Instead, the discussion of

"intimidation, ridicule or insult" arose in cases holding that to be actionable,

discrimination was not *limited* to traditional terms and conditions of employment such as

economic or tangible actions.  Meritor Savings Bank v. Vinson, 477 U.S. 57, 64 (1986)

Based on this, the Supreme Court's case law has consistently been that in order

for a hostile environment to be actionable, "it must be sufficiently severe or pervasive to

alter the conditions of the victim's employment and create an abusive working environment." <u>Meritor</u>, 477 U.S. at 67.  Thus, the <u>Rattigan</u> opinion that states "a hostile environment under Title VII must be based on one unlawful employment practice of pervasive, insulting, discriminatory conduct that makes the plaintiff's day-to-day work environment severely abusive" is not required by any Supreme Court or D.C. Circuit precedent.[2]

The D.C. Circuit Court of Appeals decision in <u>Singletary v. District of Columbia</u>, 351 F.3d 519 (D.C. Cir. 2003) should leave no doubt that discrete acts can and should be considered as a part of a hostile environment claim.  In holding that the plaintiff's claims could pass hostile environment muster, the Court of Appeals specifically considered and discussed such discrete acts as a non-promotion and an office assignment to an unheated storage room. Specifically, the Court of Appeals opined:

> Nor can we accept the defendants' further suggestion that no reasonable fact-finder could find a hostile work environment here. In addition to the alleged 1993 discriminatory failure to promote and 1993-94 failure to provide him with the tools necessary to accomplish his assignments … Singletary made a host of allegations that the court ruled did have merit but that it erroneously thought were untimely for a hostile work environment claim.  Most significantly, the district court determined that, notwithstanding the availability of appropriate office space, the defendants intentionally assigned Singletary to work in an unheated storage room for over a year and a half as "retaliatory discrimination" for the filing of a discrimination complaint.

*Id.* at 528.

---

[2] The holding that Defendant cites in its Motion should be considered *dicta*, since the discrete acts on which the Plaintiff in <u>Rattigan</u> attempted to base his hostile environment claim had not been individually exhausted. <u>Rattigan</u>, 503 F. Supp.2d at 82 (holding that if an employee was repeatedly denied promotions it would not create a hostile environment claim based on pervasive intimidation, insult and ridicule particularly because "plaintiff failed to exhaust administrative remedies for many of the discrimination and retaliation claims that he now incorporates into a hostile environment claim.").

Moreover, the Defendant in the case at bar overlooks the fact that the actions complained of here, including two proposals to suspend and being reassigned to the Suitiland Zone, being publicly accused of impropriety by his supervisors at an all hands meeting, and being reprimanded include both disparate acts and other hostile acts that were part of the same conduct and that – while not overtly insulting or ridiculing – certainly did have an intimidating effect on Mr. Winston.

In Silver v. Leavitt, 2006 WL 626928 (D.D.C. 2006) (J. Bates), the District Court held that "simply being rejected for positions with an agency cannot be transformed, without more into the severe, pervasive, abusive conduct necessary to state a hostile environment claim." Id. at *13. This holding, however, must be placed into the proper context, since the holding was arrived at after the District Court determined that the Plaintiff had failed to properly exhaust administrative remedies with respect to the discrete acts that constituted the alleged hostile environment claim. Id. at *9-11. Therefore, the Silver holding can be read to be a mere exercise of the ruling in Morgan, which is oft quoted in the decision. In the case at bar, Mr. Winston's claims were properly exhausted and Mr. Winston, does not complain of mere non-selections "without more."

The next case the Defendant cites, Childs-Pierce v. Utility Workers Union of America, 383 F. Supp.2d 60 (D.D.C. 2005)(J. Bates), actually supports Mr. Winston's contention that discrete acts can constitute disparate treatment if they are sufficiently severe and pervasive. In Childs-Pierce, the District Court examined each of the discrete acts that constituted the plaintiff's hostile environment claim and determined that in each,

the defendant had had a legitimate non-discriminatory reason.  The District Court then

held, with respect to the hostile environment claim:

> The events simply are not, individually or collectively, sufficiently severe
> or pervasive to constitute a hostile work environment claim.  Furthermore,
> the acts fail to satisfy the requirement that plaintiff show a pervasive,
> severe and *discriminatory* hostile work environment, because the Court
> has already found the acts to be non-discriminatory.

(emphasis in the original).

In the following discussion to which the Defendant in the case at bar cites (Def's

Mot. at 17), the District Court in <u>Childs-Pierce</u> opines that in order for discrete acts to be

actionable they must either be severe or pervasive, in and of themselves, or be related to

other severe and pervasive conduct:

> [plaintiff] attempts to cobble together a hostile work environment claim
> for discrete acts … that are neither severe or widespread. Plaintiff has
> presented no other evidence supporting an inference of racial
> discrimination, or a severe, pervasive, hostility in the workplace, and mere
> reference to alleged disparate acts of discrimination against plaintiff
> cannot be transformed, *<u>without more</u>*, into a hostile work environment
> claim.

*Id.* at 79 (<u>emphasis added</u>).

The <u>Childs-Pierce</u> decision is therefore consistent with <u>Singletary</u>, in the holding

that discrete actions can be considered alone, or along with other harassing conduct to

determine whether a hostile environment exists.

The next two cases proffered for the government's position are *Edwards v. EPA*,

456 F.Supp.2d 72 (D.D.C. 2006)(J. Bates) and *Keeley v. Small*, 391 F.Supp.2d 30

(D.D.C. 2005)(J. Bates). In both cases, the District Court Judge refers without discussion

to his prior decision in *Lester v. Natsios*, 290 F.Supp.2d 11 (D.D.C.)(J. Bates).  These

three cases are premised on the District Court's apprehension that "it is not at all clear

that mere reference to alleged disparate acts of discrimination against plaintiff can ever be transformed, without more, into a hostile work environment claim." Id. at 32. It is important to note, however, that <u>Lester v. Natsios</u> was decided – not on the grounds that discrete actions cannot (taken alone) comprise a hostile environment, but on the determination that, the "discrete acts … are neither severe [or] pervasive nor (as the Court has already concluded) discriminatory." Id. at 33.

The Defendant has presented no cases demonstrating that the law of this Circuit precludes considering discrete actions, standing alone, as the basis for a hostile work environment. This Court need not decide that question here, however, since the discrete acts that comprise Mr. Winston's hostile environment claim are not presented alone, "without more."

## IV.   CONCLUSION

For the foregoing reasons, Defendant's "Motion to Dismiss and for Summary Judgment should be denied.

Respectfully Submitted,

    /s/ *Sundeep Hora*
Sundeep Hora (D.C. Bar No. 472944)
ALDERMAN, DEVORSETZ & HORA PLLC
1025 Connecticut Ave., NW
Suite 615
Washington, D.C. 20036
Tel. 202.969.8220
Fax 202.969.8224
E-mail: shora@adhlawfirm.com

**COUNSEL FOR PLAINTIFF**

36

## <u>CERTIFICATE OF SERVICE (ECF)</u>

I certify that on November 26, 2007, I electronically filed the foregoing with the Clerk of the Court by using the Court's Electronic Case Filing (ECF) system that will send a Notice of Electronic Filing to the following:

Heather D. Graham-Oliver
Counsel for Defendant

heather.graham-oliver@usdoj.gov
richard.simmons2@usdoj.gov


     /s/  *Sundeep Hora*        
Sundeep Hora

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TOMMY J. WINSTON | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. 07-1411 (RWR) |
| CRISTIÁN SAMPER, | ) |
| Acting Secretary | ) |
| Smithsonian Institution | ) |
| | ) |
| Defendant**.** | ) |
| | ) |

**ORDER**

Upon consideration of Defendant's Motion to Dismiss, and the opposition thereto,

it is this the ___ day of _____, 2007, ORDERED that the Defendant's

Motion be DENIED.  Defendant is directed to file an Answer to the Complaint no later

than ___ days after receipt of this order.


SO ORDERED.


_____
U.S. DISTRICT COURT JUDGE

## Winston, Tommy

| | | | |
|---|---|---|---|
| **From:** | Samec, David | **Sent:** | Wed 1/18/2006 7:06 AM |
| **To:** | Ridgeway, Jeffrey | | |
| **Cc:** | Winston, Tommy; Gastright, Kendra | | |
| **Subject:** | Re: 2773 for Debbie / Boilers | | |
| **Attachments:** | | | |

Jeff,

Include as much detail as necessary to push the 2773 through quickly to Debbie.

Cc Tommy. .This is now a maintenance project/contract issue and in your court. This is a change to how we have been doing business previously. Tommy is now running the day-to-day maintenance (planned and unplanned--SWOs), which is a subset of your building maintenence program. You and Kathleen will now run minor repair and maintenance contracts, with Tommy's assistance to you as needed. Tommy will have to inform you when he finds SWO's beyond some arbitrary threshholds, say 40 hours or $2,500 or the inability of our in-house folks to handle it. Then you, acting as more of a program and project manager, must make the decision on how to proceed within your budget. You'll have to recommend to me to pull budgetted 1st echelon maintenance funds from Tommy or ask me for more funds--either from elsewhetre in the zone or HQs.

Is this making more sense? Call me if not.

Vr,
Dave

-----Original Message-----
From: Ridgeway, Jeffrey <RidgewayJ@si.edu>
To: Samec, David <samecd@si.edu>
Sent: Tue Jan 17 06:39:04 2006
Subject: 2773 for Debbie / Boilers

Dave was the wording for this 2773 to be generic in relation to the type of work we are looking for. Would it be best to include a blurb about each of the boiler issues we have on the master list?

Would it be wise to forward the list to Tommy again and let him take it over for action?

(Sorry for all the nuisance questions but until I can fully understand the work flow I am not sure how you want to handle this)


Jeff Ridgeway

Smithsonian Institution

NMAI Facilities Manager

202-633-6721 / Fax 202-245-0031

**EXHIBIT**

**A**

# Smithsonian Institution                    MEMO

**Office of Facilities Management – East Mall Zone**

**Date**   January 23, 2006

**To**    Tommy Winston

**cc**    Director, Office of Facilities Management and Reliability
Zone Manager, Suitland Zone
Unit File

**From**   David Samec   _David Samec_  1/23/06
Zone Manager – East Mall Zone

**Subject**   Reassignment

**Effective January 24, 2006,** you are being reassigned to **Suitland Zone** as Facility
Management Specialist, GS-1640. You will **report to Maurice Evans** at 7:30 am at the
MSC Building, Room 1604. Mr. Evans' phone number is (301) 238-1129, should you
need to contact him.

Your initial assignment in the Suitland Zone will be under your current Position
Description of Facility Management Specialist, and initially consist of:

> Helping to schedule contractor's work
> Providing cost estimates and scopes of work for various jobs
> Assisting the zone in revising the 5 year maintenance plan
> Purchasing contractor services
> Helping the zone track work tickets in Facility Center

I remind you in your transfer to Suitland Zone to not enter the National Air & Space
Museum.  Moving to Suitland should relieve your need to park at NASM.

If you need assistance in moving your personal or professional belongings, please work
with Jeff Ridgeway at NMAI.

Signature below does not denote Employee agreement with this action; it only represents
receipt of the reassignment notice.

_____                    1/23/06
Acknowledgment of Receipt                              Date

_I do not concur. I feel my right have been violated_

SMITHSONIAN INSTITUTION
Natural Air and Space Museum
7th and Independence Ave, SW
Washington, D.C., 20560
Phone 202.633.2581

Witnessed by _____  1/23/06

**EXHIBIT
B**


---

ⓘ You replied on 2/6/2006 10:54 AM.

**Winston, Tommy**

| From: | Chase, Emanuel | **Sent:** | Mon 2/6/2006 10:21 AM |
|---|---|---|---|
| To: | Winston, Tommy | | |
| Cc: | | | |
| Subject: | Re: FW: Move to NMAI | | |
| Attachments: | | | |

No one discussed this with me.  Thanks

>>> Winston, Tommy 02/06/06 09:16AM >>>
Mr. Chase,
I requested on January 23, 2005 in a written statement to Mr. Dave Samec to
interview you on my actions in NASM.  Mr. Samec has informed me that a SI
employee has alleged that I have committed an act of violence in the workplace
towards them.  I was also told by Mr. Samec not to enter NASM until after the
investigation.  I have asked Mr. Samec to talk with you to see if this
allegation is true and to see if there are any formal charges file against me
through your office.  Has Mr. Samec contacted you yet? Thanks Tommy


-----Original Message-----
From: Samec, David
Sent: Thursday, January 19, 2006 5:44 PM
To: Winston, Tommy
Subject: Move to NMAI
Importance: High


Tommy,

To restate what I am requesting you to do effective 0001 hours on January 20
(Friday):

1. Report to work at NMAI.  You are now hooked up on PC in the Crafts Office.
Send me an email once you are on-line and let me know the phone extension at
your desk.  Jeff and Kathleen can help you with getting support from NMAI IT
or OCIO.

2. Until further notice, do not enter the NASM building.

3. Also, do not attend meetings where Kendra Gastright may be present.  Ask me
if you think that she may be at a meeting that you need to be at.  Please send
Ed Tyson or Robert Lane to meetings on your behalf, such as the EMZ Staff
meetings.

4. Continue to equally support the maintenance issues in both museums, NMAI
and NASM, to the best of your ability, given these constraints that I have
placed upon you.

I anticipate being able to provide you any changes to the requests that I have
stated above once I have finished investigating this issue in a few working
days.

**EXHIBIT C**

Vr,
Dave

David W. Samec, P.E., CFM
East Mall Zone Facilities Manager
Smithsonian Institution
Work: 202.633.2652
Mobile: 202.391.8526
Fax: 202.357.4579
Email: samecd@si.edu

-----Original Message-----
From: Fleming, Kathleen
Sent: Thursday, January 19, 2006 12:23 PM
To: Samec, David
Cc: Ridgeway, Jeffrey
Subject: Computer


David,

I moved the computer that was not being used in our office into Lane's office
for Tommy to use.  I ask IT to connect Tommy*s PC to the copier in our office.
We are working on purchasing addition printers for Tommy and Lane.

Lane already has a working computer and printer at his desk.  I check Lane's
computer and the computer is in good working condition.  However, Lane and
Winston will get an new PC when OFMR receives their new computers.

Tommy*s computer has been installed.

To: Samec, David <samecd@si.edu>
CC: Bechtol, Nancy <BechtNa@si.edu>
Sent: Mon Feb 06 13:03:34 2006
Subject: RE: Move to NMAI

Dave,

Would you please share with me on the status of my investigation?  On you e-mail dated 19 January 2006; you stated that you will 'have finished investigating this issue in a few working days." It has been over two weeks since you moved me out of the East Zone and ordered me not to enter into National Air and Space Museum (NASM).  These direct statements of "not entering into NASM" are listed in an e-mail 19 January 2006, and a reassignment letter dated 23 January 2006.  I would like to know what I have been formally charged with that warrants me not to be able to enter into a Smithsonian's museum (NASM) during operational and non-operational times.  I also asked you in my statement that I gave you on 23 January 2006, to please interview Mr. Chase, OPS Security Manager at NASM on my behalf.  Please let me know if you have interviewed him yet. I am very concern about this investigation and anxious to clear my good name for any wrong doing that I may be formally charge with.  I believe that the truth crush to the earth will still rise.   Thanks Tommy

---

From: Samec, David
Sent: Thu 1/19/2006 5:43 PM
To: Winston, Tommy
Subject: Move to NMAI

Tommy,

To restate what I am requesting you to do effective 0001 hours on January 20 (Friday):

1. Report to work at NMAI.  You are now hooked up on PC in the Crafts Office.  Send me an email once you are on-line and let me know the phone extension at your desk.  Jeff and Kathleen can help you with getting support from NMAI IT or OCIO.

2. Until further notice, do not enter the NASM building.

3. Also, do not attend meetings where Kendra Gastright may be present.  Ask me if you think that she may be at a meeting that you need to be at.  Please send Ed Tyson or Robert Lane to meetings on your behalf, such as the EMZ Staff meetings.

4. Continue to equally support the maintenance issues in both museums, NMAI and NASM, to the best of your ability, given these constraints that I have placed upon you.

I anticipate being able to provide you any changes to the requests that I have stated above once I have finished investigating this issue in a few working days.

Vr,
Dave

David W. Samec, P.E., CFM
East Mall Zone Facilities Manager
Smithsonian Institution

**EXHIBIT D**

**Winston, Tommy**

| | | | |
|---|---|---|---|
| **From:** | Samec, David | **Sent:** | Mon 2/6/2006 7:24 PM |
| **To:** | Winston, Tommy | | |
| **Cc:** | Bechtol, Nancy | | |
| **Subject:** | Re: Move to NMAI | | |
| **Attachments:** | | | |

Tommy,
Yes, my investigation is complete. I'll discuss my findings with you when we meet tomorrow.
Dave

-----Original Message-----
From: Winston, Tommy <WinstTo@si.edu>
To: Samec, David <samecd@si.edu>
CC: Bechtol, Nancy <BechtNa@si.edu>
Sent: Mon Feb 06 19:14:05 2006
Subject: RE: Move to NMAI


Dave,

With all due respect would you please address my e-mail and answer my questions. I am only interested in
meeting with you if your investigation is over. Once again I am concern about this investigation and what it is
doing to my good name and my career. I believe that injustice has been done to me. Injustice to one person
is injustice to all. Tommy


---

From: Winston, Tommy
Sent: Mon 2/6/2006 2:24 PM
To: Samec, David
Cc: Bechtol, Nancy
Subject: RE: Move to NMAI


Dave,
I will meet you at Maurice's office tomorrow at 0930hrs (Maurice is out of town). Are these findings final?
Have you interview Mr. Chase in my behalf as I requested? Please advise. Tommy

-----Original Message-----
From: Samec, David
Sent: Monday, February 06, 2006 2:14 PM
To: Winston, Tommy
Cc: Bechtol, Nancy; Evans, Maurice
Subject: Re: Move to NMAI

Tommy,
I would like to meet with you at 9:30 am tomorrow, Tuesday, Feb 7, to discuss my findings. I can be out to
Suitland at that time. Would it be easiest for us to meet at Maurice's office?
Dave

-----Original Message-----
From: Winston, Tommy <WinstTo@si.edu>

**EXHIBIT
E**

# Smithsonian ınstitution      MEMO

**Office of Facilities Management – East Mall Zone**

Date   February 7, 2006

To   Tommy Winston
Facilities Management Specialist

cc   Unit File

From   David Samec    _David Samec_   2/7/06
Zone Manager, East Mall Zone

Subject   Proposal to Suspend

This is to notify you that I propose to suspend you from work and pay from your position of Facilities Management Specialist, GS-1640-13, for one calendar day, for your misconduct.

On January 15, 2005, Kendra Gastright, East Mall Zone Building Manager, notified me of a meeting that she had with you on January 13, 2006. In that meeting, Ms. Gastright attempted to discuss some work-related issues and to explain what was bothering her regarding your work interactions with each other. She told you that she feels that you belittle her both privately and occasionally publicly when she discusses work with you and you react so sarcastically. She said that you suggested that you have an "E-9 sense of humor" and were teasing her, and that she took things too personally. She agreed, and asked you not to tease her because she feels insulted when you do so. Ms. Gastright said that you then changed the subject and stated that she and Jeff Ridgeway could not "make things work," and that you had to communicate to the maintenance personnel without Kendra and Jeff present because of how screwed up they were. Ms. Gastright said that you further accused her of not helping people, and told her that she was not a team player because the night before, she pulled a report for you then stated that she hoped that you could do the report in the future. In addition, Ms. Gastright stated that you told her that she does not support an African American museum. Ms. Gastright stated that throughout the entire meeting, you never agreed to stop responding to her so sarcastically or to stop "teasing" her publicly.

When I asked you about your meeting with Ms. Gastright, you stated that nothing happened. I do not believe that "nothing happened," as I have no reason to believe that Ms. Gastright would make up such a detailed story if it were not true. Instead, I believe that you conducted yourself inappropriately and unprofessionally in your meeting with Ms. Gastright, and that your conduct was disruptive to the work environment. Further, your refusal to stop teasing and belittling Ms. Gastright both privately and occasionally

SMITHSONIAN INSTITUTION          1
Natural Air and Space Museum
7th and Independence Ave, SW
Washington, D.C., 20560
Phone 202.633.2581

**EXHIBIT
F**

publicly is disrespectful and will not be tolerated. The Smithsonian Institution and I must be able to rely on you, as we rely on all employees, to conduct yourself professionally in all work-related situations without causing disruption.

In proposing this action, I have considered your ten years of service with the Smithsonian and your generally satisfactory performance. I have also considered your lack of previous discipline. However, I find your misconduct to be so serious that it warrants a one-day suspension.

I warn you that it is your personal responsibility to prevent any recurrence of misconduct, and advise you that more serious disciplinary action will very likely result from such a recurrence, up to and including removal.

If you believe that a personal problem has contributed to or caused your misconduct, please free to participate in the Smithsonian Institution's Employee Assistance Program (EAP). You may do this by contacting Steve Neslen, Debbie Burney or Karen Howard. They are counselors located in the Ripley Center, room 3046A, telephone number 202-633-1051. They will maintain the confidentiality of any conversation you choose to have with them. If you ask to speak to a counselor on work time, I will grant you administrative time for this purpose.

The EAP provides initial counseling and referral to facilities geared to assist employees in resolving personal problems or health-related problems. The Smithsonian supports an employee's participation in the EAP by granting appropriate leave and, depending on circumstances, considering that participation as a mitigating factor in a disciplinary decision.

You may reply to this proposal orally, in writing, or both, and you may submit affidavits or other documentary evidence in support of your reply. If you make arrangements with me in advance, you may have a reasonable amount of official time to prepare your response. If you choose to reply, you must present your reply to the deciding official, Nancy Bechtol, Director, Arts and Industries Building, Room 2269, Phone Number 202-357-1927, within 10 calendar days after you receive this notice. Consideration will be given to extending the 10-day reply period if you submit a written request to the deciding official describing the need for and length of the extension you desire.

You may review the material on which I have relied in making this proposal, which is available in Room 2269.

If you wish to be represented or accompanied by a representative, you must identify that person, in writing, to the deciding official as soon as possible. Any change in your choice of representative also requires written notification. A copy of this proposal is attached for

SMITHSONIAN INSTITUTION                                                                         2
Natural Air and Space Museum
7th and Independence Ave, SW
Washington, D.C., 20560
Phone 202.633.2581

you to give to your representative, if you choose to have one.

This notice is a proposal only. Any reply and supporting material you present will be fully considered before a decision is made. You will receive a written decision as soon as practicable after your reply or after the period for replying expires. Until you receive the final decision, you will continue in an active duty status and should report to work as scheduled.

If you would like advice about your rights or about the procedures to follow, please contact our Human Resources Specialist, Gwendolyn Kennedy, 750 Ninth Street, N.W., Suite 6100, telephone 202-275-0935.

Signature below does not denote employee agreement with this action; it only represents receipt of the proposal notice.

_____          _____
Acknowledgement of Receipt                                Date

*I do not concur with this proposal. I still believe my civil rights are being violated*

*Tony West*

*7 Feb 06*

SMITHSONIAN INSTITUTION                                                                          3
Natural Air and Space Museum
7th and Independence Ave, SW
Washington, D.C., 20560
Phone 202.633.2581

# Smithsonian Institution

Office of Facilities Management – East Mall Zone

MEM O

| | |
|---|---|
| Date | February 15, 2006 |
| To | Nancy Bechtol<br>Director |
| From | Tommy Winston *Tommy Winston 15 Feb 06*<br>Facility Management Specialist |
| Subject | Reply to Proposal to Suspend, dated 7 Feb 06 |

This memo is to notify you that this is my official written reply and I wish to meet with you on the proposed to suspend memo. I received the memo from Mr. Samec, dated February 7, 2006. Mr. Samec's proposal is for me to be suspended from work and pay for one calendar day for misconduct. I disagree with his decision that I miss conducted myself in the workplace. I have always presented myself as a professional in the workplace. In my 23 years of Federal Service, and my 10 years of working at Smithsonian Institution, I have never received any adverse or disciplinary actions taken against me for any reason. I have never received a letter of Caution or a Letter of Reprimand from any of my supervisors, past or present. I have tried my best to do my job to the best of my ability. I have been tasked-orientated and mission driven to get the projects done in the East Mall Zone since October 2002, when I was named the East Zone Liaison. This was before Dave Samec, Jeff Ridgeway, Rick Cochran, and Kendra Gastright was even assigned to the East Mall Zone. Richard Kowalczyk, Facility Manager (at the time), Gary Houston, Asst. Facility Manager, Les Heacock, Project Manager, Edward Tyson, Chief of Engineering, and Mr. Emanuel Chase, OPS Security Manager can verify this information, as they were present when I was installed in the East Mall Zone. I would like you to revisit Mr. Samec's memo to get the facts. We need to know what really happen in the East Mall Zone. I do not believe that Mr. Samec's information is accurate in his memo. I do not believe Mr. Samec interviewed all the key personnel (Charlene Tyson and Mr. Lane) that were in the office area on January 13 2006.

Mr. Samec says that on January 15, 2005, Ms. Gastright notifies him that she and I had a meeting in her office on January 13, 2006, and that she told him that "I belittled her both private and occasionally publicly when she discuss work with me". Mr. Samec also states that Ms. Gastright felt that I answered her "sarcastically" during the entire meeting and never agreed to stop "teasing" her publicly. I am not sure when or if Ms. Gastright notified Mr. Samec on our meeting, but I do not believe that it was done on January 15, 2005. I believe not only was Mr. Samec inaccurate on the date, I also believed that the information that is stated in Mr. Samec proposal to suspend memo is also inaccurate. Ms. Gastright and I did meet on January 13, 2006, in her office at her request. We discuss (just the two of us) on how we could work better with each other managerial styles. We talked openly and honestly about each other's strengths and weakness. We talked manager to manager as she requested. We did not belittle each other nor were there any

SMITHSONIAN INSTITUTION<br>Natural Air and Space Museum<br>7th and Independence Ave, SW<br>Washington, D.C., 20560<br>Phone 202.633.2581

EXHIBIT
G

threats to each other (physically, mentally or verbally) or any situations that could be considered violence in the workplace during our discussion. We agreed to agree on some things and agreed to disagree on other things. I felt it was a very productive meeting and I wished that we would have this meeting sooner. Once our meeting was over, we agreed to make some changes on how we would conduct business in the East Mall Zone. Ms. Gastright and I agreed to be friends and we shook hands after our meeting. I was pleased that Ms. Gastright and I were going to work together professionally. I do not believe that Ms. Gastright told Mr. Samec that I belittled her or was violent towards her in any way. Mr. Samec informed me on 19 January 2006, that Ms. Gastright told him that I was a threat to her and I must be moved out of NASM. I do not believe that Ms. Gastright told Mr. Samec that I was a threat to her and wanted me out of NASM. This can be verified by Mr. Lane, Ms. Morina, and Mr. Houston. On January 25, 2006, Mr. Lane called me on the phone to tell me that he had just came from a town meeting where Mr. Samec was persecuting me publicly in the town meeting. Mr. Lane also informed me that after he town meeting, Mr. Houston approached him and Ms. Morina and told them that during the town meeting, Ms. Gastright told him (Mr. Houston), that "she did not know why Dave is saying bad things about Tommy," and that she told Dave that, "Tommy did not do anything to her". I called Ms. Barbara Morina to verify what Mr. Lane had told me. Ms. Morina said that it was true. Both Mr. Lane and Ms. Morina are will write a statement or an affidavit saying that this is what they had heard from Mr. Houston. They are also willing to be interviewed by Mr. Samec, or you if necessary. I believe that they are telling the truth and think that their statements are paramount to this situation. The next day Mr. Houston talked to me after our FM class (GMU) on January 26, 2006, and told me that Ms. Gastright told Mr. Samec "she was not going to write a statement against me because I did nothing to her". Mr. Houston told me that Ms. Gastright said, "Mr. Samec escalated the situation out of proportion and that she did not wanted me moved". Ms. Gastright told Mr. Samec that "she could not work with me and not that I could not work with her". Ms. Gastright wanted Mr. Samec to move her out of the East Mall Zone. Mr. Samec states that Ms. Gastright told him that I did "several things that were unprofessional and disruptive during our entire meeting". This statement too is inaccurate and I am requesting that you please revisit these allegations. I do not believe that Ms. Gastright told Mr. Samec that it was a bad meeting and I was sarcastic and teased her publicly. Mr. Samec's proposal to suspend memo is vague on these alleged accusations. Mr. Samec never talks about what projects, or dates that I private or public belittles, tease, or any misconduct that I did while in the workplace. During the periods of January 9, 2005 until August 1, 2005, I was assigned to the East Mall Zone as the Project Coordinator. As a professional and as a manager, I saw an opportunity to change an environment in the Air and Space Museum. There were employees that needed my assistance to be re-motivated in getting the job done, so I made some small changes in the workplace without commenting. I used my gifts (as a COTR, administrator, maintenance manager, and supervisor) to activate the talents of Ms. Charlene Tyson, Ms. Janice Dailey, Ms. Cathye Young, Ms. Estelle Washington, Mr. Robert Lane, Mr. Edward

Tyson, and Mr. Andrew White. With their creative ideas and synergy, they turned systems and process around and in turn was able to turn the office atmosphere around to foster a safe and productive work environment. They made coming to work a pleasure and learning exciting. We share knowledge and challenges together. During that period there was no misconduct or and negative situation by me with anyone in the East Zone. This situation can be verified by all the personnel that I named previously. I am asking that they be interviewed by Mr. Samec and by you if necessary. From August 1, 2005 until January 3, 2006, I was detailed to the POB for the Commissioning Process. I had a great time at Gallery Place Zone (GPZ) working with the SI employees in that zone. So I tried to narrow down the period when I was suppose to had belittle Ms. Gastright since Mr. Samec is not specific in his allegations. These private belittles and teasing would have to taken place after January 4, 2006. My statement to Mr. Samec on what happen confirms that Ms. Gastright and I worked in a professional manner during the period after January 3, 2006 until January 23, 2006, and then I was reassigned out of the East Zone. In Mr. Samec proposal to suspend letter he states that Ms. Gastright told him that I said that she and Jeff Ridgeway "could not make things work". Mr. Samec's memo also went on to say that Ms. Gastright told him that "I had to communicate to the maintenance personnel without Kendra and Jeff present because of how screwed up they were." I do not believe that Ms. Gastright told Mr. Samec that I said negative things about Mr. Ridgeway and her concerning the maintenance staff. This statement is also inaccurate and can be verified. On January 6, 2006, in Mr. Samec's Friday zone meeting, Mr. Samec named me to the day-to-day maintenance operations in the East Mall Zone. I told Mr. Samec and Ms. Gastright that she and Jeff Ridgeway had full access to Mr. Lane and Mr. Tyson and all she had to do was to cc me on all e-mail so I would stay in the loop. I also restated that Mr. Ridgeway and Ms. Gastright had full access to Mr. Lane and Mr. Tyson on January 13, 2006 in two different meetings. The morning meeting with Ms. Gastright and myself, and Mr. Samec's Friday afternoon zone meeting. This time Mr. Ridgeway was present at this zone meeting. Mr. Ridgeway asked me the question on how to get work orders done in the zone. I told Mr. Ridgeway that he and Ms. Gastright had full access to Mr. Lane and Mr. Tyson for any of their projects or situation. I asked Mr. Ridgeway just to cc me on all e-mail so I would stay in the loop. This can be verified by Mr. Lane, Mr. Tyson, and Mr. Ridgeway on how I was working with them and the maintenance personnel. On January 11, 2006, I had all the USRO's and all the Crafs personnel to meet me in NMAI for a "gang box talk" I spoke on how we were going to be ONE Zone like you have been trying to get the East Zone to become. I told them that I thought Jeff and Kendra had done a great job and I admired what they had accomplished and that we were going to build off their foundation. I told them that I had nothing but love for Kendra and Jeff and that I was going to work on myself to become a better manager. I told them this was our first meeting but in the future, we were going to invite Jeff, Kendra, Gary, and Kathleen if they would like to come. I told them that we will become one zone and my only goal was to turn 4th Street in to a curve. We had a very nice discussion, (approx 23 personnel) it started at 8 am and lasted until 9 am. Mr. Tyson

SMITHSONIAN INSTITUTION
Natural Air and Space Museum
7th and Independence Ave, SW
Washington, D.C., 20560
Phone 202.633.2581

and Mr. Lane are requesting that you come and speak to their workers about my intentions. They felt that we had something good going and felt the energy that we were about to accomplish. I am requesting that Mr. Samec or you interview Mr. Tyson (Supervisor), Mr. Lane (Supervisor), Mr. Watts (Supervisor) Mr. Beasley (Leader), Mr. Coward (Leader), Mr. Kennedy (Leader) and any or all of the workers from the Crafts Shop or HVAC Shop to verify what I said in this meeting. In Mr. Samec's proposal to suspend memo, he states that "I accused her of not helping people" and "not being a team player' is also not accurate. Ms. Gastright has never pulled a report off for me. I am just as qualified as she is to get around on Facility 8i. I can also perform timekeeping function if needed. Mr. Samec's never specifies what report that Ms. Gastright "pulled" for me. Ms. Gastright and I have worked on several projects together like the 30-year facility plan. We went down each functional area using NASM schematics and blueprints to layout a logical and well-thought plan to upgrade the entire building in a maintenance long-range schedule. Therefore, I know that Ms. Gastright is a team player because we have done several NASM projects together. I can give you a long list of projects if needed. Mr. Samec's memo also states something about the African American Museum and she does not support it. This statement is also inaccurate and out of place. I do not believe that Ms. Gastright and I ever talked about the African American Museum before. I am not sure why the subject would ever come up between us unless she thought that Mr. Houston or I would be good candidates for the Facility Manager position.

Mr. Samec told me that I am being investigated for violence in the workplace, but in his propose to suspend memo he never reference to the Smithsonian Directive 217 that governs this action nor does he ever uses the phrase or any wording which violence in the work place appears. Mr. Samec never states that I cursed at Ms. Gastright or used abusive language. In my statement to Mr. Samec on January 23, 2006, I request Mr. Samec to interview Mr. Chase on my behalf about my conduct at NASM. Mr. Chase informed me that he has not nor any of his officers have not received any information that I was a threat to any one in NASM ever. Mr. Samec never talked to nor interview Mr. Chase, OPS Security Manager, on this matter. I have an e-mailed dated February 6, 2006, where Mr. Chase says that no one has discuss anything about me being violent in the workplace towards any SI employee. I can make my statement I gave to Mr. Samec on January 23, 2006 and this e-mail from Mr. Chase available to you at your request. However, Mr. Samec is directing me to stay out of NASM and there are no formal charges filed against me for violence in the workplace anywhere in the Smithsonian Institution. I have asked Mr. Samec in an e-mail dated February 6, 2006, and when he issued my proposal to suspend memo on February 7, 2006, what have I been formally charged with that warrants me not to be able to enter into the NASM? Mr. Samec refuses to answer this question. Mr. Samec has reassigned me to another zone because of the allegation that he said are against me. Now he wants to suspend me for one day. To be removed out of the zone, then to be suspended for one day without pay for the same incident (an incident that I am innocent) is "double jeopardy' in legal terms. I am being punished twice for the same incident.

SMITHSONIAN INSTITUTION
Natural Air and Space Museum
7th and Independence Ave, SW
Washington, D.C., 20560
Phone 202.633.2581

In my humble opinion, I believe that Mr. Samec needed to take a closer look into wl at really happening in the East Mall Zone. Mr. Samec needs to thoroughly search for t he truth and then make the right decision in the best interest to the Smithsonian Institut on. I believe that Mr. Samec did not prepare his investigation well. I believe that Mr. Sar ec should have launched a full investigation make sure that all personnel in the area (especially in the office area) had in opportunity to be interview.

Ms. Bechtol please revisit this investigation so we can reveal the truth and I can be exonerated from the current allegations that Mr. Samec has lodged.  Thanks.

SMITHSONIAN INSTITUTION
Natural Air and Space Museum
7th and Independence Ave, SW
Washington, D.C., 20560
Phone 202.633.2581

**Winston, Tommy**

| | | |
|---|---|---|
| **From:** | Winston, Tommy | **Sent:** Wed 3/22/2006 6:03 AM |
| **To:** | Bechtol, Nancy | |
| **Cc:** | Engelen, Melanie | |
| **Subject:** | RE: Reply to Mr. Samec's proposal to suspend | |
| **Attachments:** | | |

Thursday at 1 pm is fine with me.   Your welcome Nancy, see you soon.  Tommy

---

**From:** Bechtol, Nancy
**Sent:** Tue 3/21/2006 5:47 PM
**To:** Winston, Tommy
**Cc:** Engelen, Melanie
**Subject:** RE: Reply to Mr. Samec's proposal to suspend

OK.  Let's settle on Thurs. March 23rd at 1pm in my office then if that works for both of you.  Just let me know, and thanks Tommy.  Nancy

---

**From:** Winston, Tommy
**Sent:** Tuesday, March 21, 2006 3:41 PM
**To:** Bechtol, Nancy
**Cc:** Engelen, Melanie
**Subject:** RE: Reply to Mr. Samec's proposal to suspend

Nancy,

Anytime Thursday or Friday afternoon will be fine.  Thursday afternoon  would be ideal.  I welcome Ms. Engelen to our meeting.  Tommy

---

**From:** Bechtol, Nancy
**Sent:** Tue 3/21/2006 1:44 PM
**To:** Winston, Tommy
**Cc:** Engelen, Melanie
**Subject:** RE: Reply to Mr. Samec's proposal to suspend

Dear Tommy,
So sorry about being so slow getting back to you on this important issue.  I would like to meet with you soon, and wonder if you have some time this Thurs. or Friday afternoon?  I could meet anytime those afternoons in my office.  Let me know which day and time would be best for you Tommy.  I have cc'ed Melanie as I would like her to sit in with me when we discuss this case. Thanks, Nancy

-----Original Message-----
From: Winston, Tommy

https://webaccess.si.edu/exchange/WinstTo/Sent%20Items/RE:%20Reply%20to%20Mr.%..

**EXHIBIT H**

Sent: Tuesday, March 21, 2006 8:20 AM
To: Bechtol, Nancy
Subject: RE: Reply to Mr. Samec's proposal to suspend

Nancy,
I am quite sure that your availability has been very limited since your last e-mail to me. With all the moving parts that go on day to day in OFEO, being a good steward of your time is paramount. I am respectfully sending this friendly reminder to you so we can bring some closure to this situation. I am very concern about this investigation and anxious to clear my good name for any wrongdoing that I may be formally charge with. I still believe that the truth has not surfaced and that my rights were and still are being violated. I would like to pursue that issue once I am exonerated from the current allegations of violence in the workplace charges. I believe that the truth crush to the earth will still rise. Tommy

-----Original Message-----
From: Winston, Tommy
Sent: Tuesday, February 21, 2006 7:37 AM
To: Bechtol, Nancy
Subject: RE: Reply to Mr. Samec's proposal to suspend

Yes ma'am. Thank you. Tommy

-----Original Message-----
From: Bechtol, Nancy
Sent: Sunday, February 19, 2006 7:49 PM
To: Winston, Tommy
Subject: Re: Reply to Mr. Samec's proposal to suspend

Thanks Tommy, and yes I would like to meet with you next week.sometime. I got your hard copy too last week. Let me email you first of next week so we can find a good time. I will get back to you shortly. Nancy
--------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: Winston, Tommy <WinstTo@si.edu>
To: Bechtol, Nancy <BechtNa@si.edu>
Sent: Wed Feb 15 10:37:18 2006
Subject: Reply to Mr. Samec's proposal to suspend

Ms. Becthol,

As the deciding official on this proposal to suspend, dated February 7, 2006, I would like to formally send you my written reply and request a meeting with you at your convenience. My new supervisor Maurice Evans is not available for me to get this meeting arranged with you. I hope that I am not breaking protocol call by contacting you without my supervisor permission. I know that you are very busy with issues that are more important and I apologize in advance for the inconvenience that this may cause. I have attached my written response for you to review at your convenience. I will have a hard copy (signed) delivered to you ASAP. Tommy

# Smithsonian Institution

# Memo

**Office of Facilities, Engineering and Operations**
**Office of Facilities Management**

| | |
|---|---|
| Date | March 27, 2006 |
| To | Tommy Winston<br>Facilities Management Specialist |
| cc | Unit Folder |
| From | Nancy Bechtol<br>Director, OFMR   *Nancy Bechtol* |
| Subject | Decision on Proposal to Suspend |

This is my decision on the February 7, 2006 proposal to suspend you for one day for your misconduct.

You were given 10 days to respond to the proposal orally, in writing, or both. I received your written response dated February 15, 2006. On March 23, 2006, I met with you and Melanie Engelen, Program Management Analyst (PMOD).

In your written response, you wrote that David Samec's information in the proposal to suspend you was inaccurate. Specifically, you wrote that the date of the meeting between you and Kendra Gastright was on January 13, 2006, not January 15, 2006. Further, you wrote that the information on which the proposal was based was also inaccurate. You wrote that at the meeting on January 13, 2006, you and Ms. Gastright discussed how you could both work better with each having different managerial styles. Further, you denied belittling Ms. Gastright or making any threats. You wrote that it was a very productive meeting, and you agreed to make some changes on how you conduct business and you shook hands.

In addition, you wrote that you were told that you were being investigated for violence in the workplace, but the proposal to suspend does not mention violence in the workplace. You also wrote that you were reassigned to another zone because of an allegation that was made against you related to violence in the workplace.

In our meeting on March 23, 2006, you essentially restated the information that you provided in your written reply. You also explained that you and Ms. Gastright use strong tones, but are not threatening, and that several times you simply did not see eye-to-eye. In addition, you explained the personal challenges that you have had since November 2005.

Arts and Industries Building
900 Jefferson Drive SW Room 2269
Washington DC 20560-0424
202.357.1927 Telephone
202.786-2026 Fax

**EXHIBIT**
**I**


In making my decision, I have carefully considered all of the evidence in the case file, including your written and oral replies. I find that the proposal to suspend you stated the correct day of the meeting between you and Ms. Gastright, January 13, 2006. I have also considered whether you were charged with violence in the workplace. In reviewing the proposal and information in the case file, I do not find that you were charged with any violence in the workplace or making any threats. In fact, the proposal did not mention any allegations of threatening behavior. I have also considered the fact that, by your own admission, you explained that you and Ms. Gastright both have "tones" in your voice, and that although you use a "tone," you are not malicious. Based on the facts that I have available to me, I have decided to rescind the proposal to suspend you. Instead, I will issue a confirmation of counseling.

I appreciate that you stated that you did not mean to belittle Ms. Gastright; however, I believe that your interactions with Ms. Gastright have not always been courteous or respectful, regardless of whether you were actually just using your "tone" and did not mean any disrespect. I must remind you that your interactions with all employees, including Ms. Gastright, must be professional and courteous at all times. I expect all of my managers and employees to be professional and to exhibit courtesy at all levels. Courtesy, defined as daily behavior that is polite and considerate of others, is required of OFMR employees in all of their dealings with the general public, coworkers, supervisors, and all other SI employees.

I warn you that it is your personal responsibility to prevent any recurrence of misconduct and advise you that more serious disciplinary action will very likely result from such a recurrence, up to and including removal.

My decision to counsel you is final. You may respond to this memo in writing. Your response will be filed with this memo in our organizational file. This document and any response will NOT be filed in your Official Personnel Folder.

Arts and Industries Building
900 Jefferson Drive SW Room 2269
Washington DC 20560-0424
202.357.1927 Telephone
202.786-2026 Fax

## AFFIDAVIT OF TOMMY J. WINSTON

I, Tommy J. Winston, declare under penalty of perjury pursuant to 28 U.S.C. §
1746 that the following facts are true and correct to the best of my knowledge,
information and belief. If called upon to testify, I could and would competently testify to
the facts set forth in this Affidavit.

1.      During my tenure as a Facilities Management Specialist, GS-1640-13 with
the Smithsonian's Office of Facilities Engineering and Operations (OFEO) from January
2005 to my reassignment to Suitland in January 2006, my office was located in the Air
and Space Museum of the East Mall Zone.

2.      From January 2006 to May 2006, my office was located in the Suitland
Zone in Building 29 of the Garber Facility.

3.      During my employment with the Agency from January 2005 to May 2006
in the East Mall Zone and the Suitland Zone, I was never made aware of or notified of the
45-day time limit within which to contact an EEO counselor after an allegedly
discriminatory act or personnel action. There were never any posters, handbooks or other
materials that were conspicuously displayed or disseminated to me that contained this
information.

4.      I never had actual notice of the 45-day time limit either. If I had such
notice, I would have vigorously diligently pursued my claims against the Agency.
FURTHER the Affiant sayeth NOT.


EXECUTED: November 26, 2007

TOMMY J. WINSTON

**EXHIBIT
J**