## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TOMMY J. WINSTON,

       Plaintiff,

v.

G. WAYNE CLOUGH,
    Secretary, Smithsonian Institution,

      Defendant.

Civil No. 1:07-cv-1411 RWR

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant, G. Wayne Clough, Secretary, Smithsonian Institution, respectfully submits his motion for summary judgment on the grounds that no genuine issue of material fact exists and Defendant is entitled to judgment as a matter of law. The grounds for this motion are set forth in the accompanying Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment.  A Statement of Material Facts As To Which There Is No Genuine Issue, and a proposed order are also attached.

Respectfully submitted,

RONALD C. MACHEN, JR.
D.C. Bar #447889
United States Attorney
for the District of Columbia

RUDOLPH CONTRERAS
D.C. Bar #434122
Chief, Civil Division

_____/s/_____
ALEXANDER D. SHOAIBI

OF COUNSEL:                         D.C. Bar #423587
Daniel J. Paisley                   Assistant United States Attorney
Assistant General Counsel           555 Fourth Street, N.W.
Smithsonian Institution             Washington, D.C. 20530
                                    (202) 514-7236
                                    Alexander.d.shoaibi@usadoj.gov

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

TOMMY J. WINSTON,

       Plaintiff,

v.                             Civil No. 1:07-cv-1411 RWR

G. WAYNE CLOUGH,
   Secretary, Smithsonian Institution,

       Defendant.

---

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

## I. Introduction

Plaintiff Tommy J. Winston brought this suit alleging his employer, the Smithsonian

Institution, discriminated and retaliated against him in violation of 42 U.S.C. § 2000 *et seq*.  He

alleges discrimination or retaliation motivated the 7-day suspension he received for excessive

personal use of a Smithsonian cellular telephone and for disobeying his supervisor's instructions

related to snow removal overtime.  Winston also alleges the Smithsonian has subjected him to a

hostile work environment.  He further alleges that his transfer from the Mall to Suitland was

discriminatory, but the Court dismissed this claim.  Order, Dkt. #21, pp. 17, 26-27; May 11,

2010.  While Winston will list arguments about why his discipline was unfair, this is not a forum

for routine grievances and he is not entitled to have a jury second-guess Smithsonian

management with the benefit of hindsight and exhaustive investigation.  All of Plaintiff's claims

fail because Defendant has asserted legitimate, non-discriminatory reasons for each of the

actions upon which they are based.  With nothing to support a finding of illegal discrimination,

retaliation, or a hostile work environment, the Court should enter summary judgment in Defendant's favor.

**II. Factual Background**

Tommy Winston is, and at all times relevant to this lawsuit was, a GS-13 employee in the Smithsonian Institution's Office of Facilities Management and Reliability ("OFMR"). Exh. 1, p. 1. He presently earns a salary of $106,839 as a building manager. Exh. 2. Since January 2006, Winston has worked in the Smithsonian's Suitland Zone in Suitland, Maryland. Am. Compl. ¶ 24.

Winston has had a turbulent relationship with his supervisor in Suitland, Zone Manager Maurice Evans. In Evans's words, he and Winston did not see "eye to eye" on Evans's management style. Exh. 3, pp. 217:21 – 218:4. Winston would frequently appeal Evans's decisions to OFMR Director Nancy Bechtol, such as Evans's September 2006 decision that Winston should attend a particular training program. Exh. 4 (Evans asks Bechtol, "Why must he question everything"?). In November 2006, after both Evans and Bechtol denied Winston's request for leave on a particular day, Winston responded to Bechtol, his second-level supervisor:

> I will be on military duty this weekend so you a [sic] enjoyable weekend while I guard this great country of ours. May I ask your supervisor if he would allow me to be excused from his meeting to [sic] I can spend some time with my family?

Exh. 5, p. 3. The next month, Evans told Bechtol he wanted to discuss Winston's "requesting to see you every time I make a decision" and his "attempt to undermine my authority." Exh. 6. On February 5, 2007, Winston sparred with Evans about Winston's oversight of employee Oscar Waters who apparently had not changed a light bulb. Exh. 7. Winston chided Evans for not "let[ting] [him] handle it" versus "let[ting] [his] subordinate go around" him. *Id.* The same day, Winston also responded to Evans's request for a report Winston acknowledged was

2

"waaaaaaaaay over due."  Exh. 8.  Winston told his supervisor he would "take [his] beating like a marine."  *Id.*

### A.  Snow Removal Staffing Instructions

The next day, February 6, 2007,  Winston attended Evans's meeting about snow removal planning.  Am. Compl. ¶ 32.  Assistant Building Manager David Sidbury, a GS-11 employee, was also at the meeting.  Am. Compl. ¶ 32.  While some details of the meeting are contested, the minutiae of overtime politics in the Suitland Zone are immaterial here.  It is undisputed that Evans instructed that Oscar Waters was not to participate in snow removal.  Am. Compl. ¶¶ 33. The morning after the meeting, Waters arrived at 5 a.m. and participated in snow removal despite Evans's instructions.  Exh. 9, p. 112:6-7; Am. Compl. ¶ 34.  Winston did nothing to prevent Waters from coming in, contending it was not his responsibility.  Exh. 9, p. 132:9-13.  Evans saw it differently, and when he learned that afternoon that his instructions had not been carried out and Waters participated in snow removal, Evans proceeded to draft a reprimand letter for Winston.  Exh. 10.  Evans wrote in this draft letter that Winston's "blatant disrespect of [Evans's] authority and the inability to carry out a directive can and will not be tolerated."  *Id.* at 2.  Evans also apparently discussed his discontent with Winston, and Winston then announced in e-mail that he stood "postured to reply to [Evans's] formal complaint."  Exh. 11.  Evans, Sidbury, Waters, and Winston are all African-Americans.  Exh. 12, p. 1; Exh. 13, p. 2; Exh. 14, p. 1; Am. Compl. ¶ 1.

### B.  Cell Phone Abuse

Meanwhile on the Mall, Winston's cell phone bills were being sent in error to the wrong manager, Kendra Gastright.  Exh. 15, p. 3; Exh. 16, pp. 206:11 – 207:7.  Gastright discovered Winston had "clocked" more than 2000 minutes in calls in a month, and she reported this

apparent abuse to her supervisor, OFMR Director Nancy Bechtol.  Exh. 15, p. 3.  Bechtol, in

turn, asked her managers for details about what is typical for phones.  *Id.* at 2.  Gastright replied

that she cautions users at 500 minutes (*i.e.*, less than ¼ of Winston's usage).  *Id.* at 1.  Bechtol

brought Evans, as Winston's supervisor, into the e-mail conversation and advised Evans to meet

with the office's HR liaison, presumably to consider discipline on Winston's apparent cell phone

abuse.  *Id.*

The Smithsonian's Cellular Telephone and Blackberry Policy, effective May 17, 2006,

applies to "all Smithsonian Institution employees who [u]se a cellular telephone or BlackBerry

issued by the Smithsonian."  Exh. 17, § 2.  It "allows personal use of Smithsonian-issued cellular

telephones and BlackBerries for phone or data access on an occasional and incidental basis."  *Id.*

at § 7(B).   It also refers to the Smithsonian's code of conduct, Smithsonian Directive 103,

which prohibits using Smithsonian property of any kind except for officially-approved activities,

apart from "[i]ncidental and occasional personal use of Smithsonian computer and

communications systems."[1]  Exh. 20, § 12(a).  Upon examining his bills, it became apparent that

Winston's official duties did not justify the high phone usage.  On the contrary, Winston's

"Nextel invoices clearly indicate excessive personal use, with some calls ranging from 50 to 137

minutes" and Winston "admitted it was possible some of the calls were not for official SI

business."  Exh. 21, p. 2; Exh. 22, p. 2.

With knowledge of both the cell phone misuse and the failure to follow instructions,

Evans decided to issue one proposal for both instances of misconduct.  Exh. 22; *see also* Exh. 15,

p. 1 (Evans raising with HR the issue of whether he could combine the two instances of

---

[1] While Smithsonian policy at the time did not quantify permissible levels of work use, OFMR
subsequently debated among 300, 500, and 600 as "ideas for the number of minutes each
employee should have but not exceed."  Exh. 18, p. 3.  OFMR determined there would be
mandatory discipline for users over 2000 minutes.  Exh. 19, p. 1.

misconduct).  He proposed a 7-day suspension.  Exh. 22.  In determining the level of discipline,

Evans considered, among other things, Winston's position as a senior manager.  *Id.* at 1.

Winston, represented by counsel, challenged the discipline.  Exh. 23.  He contended David

Sidbury was responsible for Waters coming into work against Evans's wishes, and he implied

Evans should have disciplined Sidbury instead.  *Id.* at 2-3; Am. Compl. ¶ 36.  Winston never

disputed that his Smithsonian phone bills were replete with personal calls, but he contended there

was no policy on cell phone use, emphasizing OFMR's efforts to clarify the policy and institute

guidelines after Evans proposed to suspend Winston.  Exh. 23, p. 4.  Nancy Bechtol, as Evans's

supervisor, considered Winston's lawyer's letter and made further enquiries to ensure her

decision was correct.  *See, e.g.*, Exh. 24, p. 3 (Bechtol "going through the lawyer's response" and

asking Evans to clarify aspects of his conversations with Winston about the snow removal).  She

checked in with Evans to ensure the content of her draft decision was correct, and he responded

"it's great it covers everything; even the discussion about the telephone usage."  *Id.* at 1.  As she

had explained in private e-mail, Bechtol determined the excuses Winston and his lawyer raised

were "bogus in every way" and that a suspension was necessary if Winston was to "stop defying

orders."  Exh. 25.  She decided to sustain Evans's proposal.  Exh. 21.  Winston served his 7-day

suspension from the Smithsonian, but he continued drawing a salary from the U.S. Treasury:  he

performed Air National Guard duties during his period of suspension.  Exh. 9, p. 118:1-3.

### C.  Problems on the Mall

More than a year before the snow removal incident, a different supervisor, East Mall

Zone Manager David Samec, proposed to suspend Winston for 1 day following an altercation

with a female coworker, Kendra Gastright.  Gastright was building manager for the National Air

and Space Museum and, although Winston held the same GS grade, he was to provide her with

maintenance support.[2] *See, e.g.,* Exh. 16, pp. 19:11 – 21:18.  Samec understood that Gastright and Winston had "communicated loudly, communicated potentially antagonistically towards each other" (Exh. 27, p. 75:1-3) and that the exchanges would leave Gastright in tears (*id.* at 78:3-11).  Gastright sent late-night e-mail to Bechtol and Samec accusing Winston of "belittling [her] publicly," "teasing" her, and spreading "a few horrible rumors about her."  Exh. 28.  Samec observed that when Gastright returned to work following her e-mail:

> she physically had looked like she had, I don't know, for lack of any better word, been through a ringer, you know, with this whole incident, that there was something that physically affected her appearance from, from the Friday incident.

Exh. 27, p. 159:3-8.[3]  Samec concluded Winston created a hostile work environment for Gastright.  Exh. 27, p. 119:15-19.  Smithsonian policy defines "violence in the workplace" as:

> physical or verbal aggression toward others or the verbalization, writing, gestures, or other forms of expression that could be interpreted by a reasonable person as communicating a direct, indirect, or potential threat to oneself or others

 Exh. 30, p. 1.  Samec understood that Winston:

> threatened [Gastright] with verbal abuse, belittling, rumors, profanity, arguing, causing her to cry, causing disruption in the office for the fellow workers, that that environment created a hostile environment which was threatening in nature and could potentially escalate to physical violence.

Exh. 27, p. 247:7-14.  The Smithsonian's policy against violence in the workplace requires supervisors to, *inter alia*, "be willing to intervene and initiate disciplinary action commensurate with the behavior in question."  Exh. 30, p. 2.

---

[2] Another zone manager, Daniel Davies, previously observed Winston "head-butting" with a similarly-situated male coworker.  Exh. 26, p. 2.  Both were "13's, and that was an issue for [Winston].  He didn't want to take direction from D[avid] R[etland].  I explained to TW that DR was ultimately responsible for the building and that he was the client…" *Id.* at p. 1.

[3] Gastright, in a "highly distraught" state, also visited Nancy Bechtol in person on or around the same time.  Exh. 29, pp. 31:14 – 32:10.  Bechtol found her hysterical and personally escorted her to an Employee Assistance Program counselor.  *Id.* at 34:16 – 35:3.

Winston alleges he was accused of threatening Gastright with physical violence.  Am. Compl. ¶ 22.  Samec's initial reaction was to separate Gastright and Winston.  He asked Winston to move his office across the street from Gastright, from the National Air and Space Museum to the National Museum of the American Indian.  Exh. 31, p. 1; Exh. 27, p. 166:5-16.  Samec instructed Winston to stay away from the Air and Space museum and meetings that Gastright would be attending.  Exh. 31, p. 1.  Samec did not, however, take more serious measures available to him, such as banning Winston from work altogether or putting the Smithsonian's security force on special alert.  Exh. 9, pp. 166:25 – 167:5.[4]  Ultimately, the Smithsonian reassigned Winston to the Suitland Zone, thus resolving the matter.  Exh. 27, p. 126:19-22.  The transfer appeared to management to be a "win-win" solution, especially considering Winston "had repeatedly asked [Samec] if he could be transferred to the Suitland zone."  *Id.* at 199:8-12.

Samec also proposed to discipline Winston with a 1-day suspension.  Exh. 32.  Samec determined that Winston conducted himself "inappropriately and unprofessionally," that Winston's "conduct was disruptive to the work environment," and that Winston's "refusal to stop teasing and belittling Ms. Gastright both privately and occasionally publicly is disrespectful."  *Id.* at 1-2.  The proposal does not accuse Winston of threatening anyone with physical violence.  *Id.* Winston submitted a memo to Director Bechtol in which he conceded a particular meeting took place between him and Gastright, but he denied any belittling or threatening.  Exh. 33.  He also questioned whether Gastright made any accusations about his behavior (*id.* at 2) and expressed the belief Samec "needed to take a closer look into what [is] really happening in the East Mall Zone" and "thoroughly search for the truth and then make the right decision in the best interest to the Smithsonian Institution" (*id.* at 5).  Bechtol met with Winston about the proposed discipline,

---

[4] Winston testified that when there are allegations of violence in the workplace, security is usually involved to keep the accused out of the relevant building.  *Id.*

considered his viewpoint, and rescinded Samec's proposal to suspend.  Exh. 34.  She concluded

Winston's "interactions with Ms. Gastright h[ad] not always been courteous or respectful" and

simply counseled him, reminding him that his "interactions with all employees, including Ms.

Gastright, must be professional and courteous at all times."  *Id.* at 2.

Winston brought an EEO complaint about Samec's proposal to suspend him (later

rescinded) and his transfer to Suitland.  Though already represented by attorney Sundeep Hora,

Winston's complaint was not timely and there was no EEO investigation.  ECF No. 7 (Am.

Compl.) ¶¶ 7, 9; ECF No. 21, p. 12.  After the EEOC affirmed the Smithsonian's dismissal,

Winston filed his original complaint in this action, a one-count complaint that does not allege a

"hostile environment."  ECF No. 1.  This Court agreed with the Smithsonian and EEOC

determinations that Winston's complaint was untimely and dismissed the underlying claim, but

the Court did not dismiss with respect to new allegations contained in the amended complaint.

ECF No. 21 at 1, 26-27.

This past counseling, transfer, and EEO history are thus relevant only insofar as Winston

claims that the Smithsonian imposed the 7-day suspension in 2007 to retaliate for his prior EEO

activity.  *See* ECF No. 7 (Am. Compl.) ¶ 49.  Between Winston's EEO complaint in 2006 and his

subsequent discipline in 2007, he received a cash award (effective August 9, 2006) [Exh. 38], a

time off award (effective August 2, 2006) [Exh. 36], a positive performance appraisal (Nancy

Bechtol signed off on a "fully successful" appraisal on January 31, 2007) [Exh. 35],[5] Bechtol's

approval to travel to an industry conference and at an expense rate above *per diem* (October 3,

---

[5] Winston refused to sign the appraisal.  Exh. 35; *see also* Exh. 27, p. 217:2-6 ("Mr. Winston had
a, had a track record for writing comments that he did not concur or he felt that something was
wrong on any kind of statement that you gave him that was not a totally positive statement").

2006) [Exh. 39], and Bechtol's selection for a museum building manager position he applied for (effective August 6, 2006) [Exh. 37].

## III. Argument

### A. Summary Judgment Standard

Fed.R.Civ.P. 56 provides that a defendant is entitled to summary judgment if there is no genuine issue as to any material fact. There is no genuine issue of material fact when the relevant evidence in the record, taken as a whole, indicates that a reasonable fact-finder could not return a verdict for the plaintiff. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Matsushita Elec. Indus. Corp. v. Zenith Radio*, 475 U.S. 574, 587 (1986). To withstand summary judgment, Plaintiff cannot rest upon mere allegations, suspicions, or denials. *See Anderson*, 477 U.S. at 248. He must show the existence of material evidence that is sufficient to require a fact finder to assess the parties' differing versions of the truth. *Id.* at 248-49. When the evidence is merely colorable or is not significantly probative, summary judgment may be granted for Defendant. *Id.* at 249-50. The "mere existence of a scintilla of evidence" in support of his position is not enough for Plaintiff to defeat summary judgment. *Id.* at 252. When the factual context renders Plaintiff's position implausible, then he must come forward with strong persuasive evidence to defeat summary judgment. *Matsushita*, 475 U.S. at 587. "Even in employment discrimination cases where elusive concepts such as motive or intent are at issue, [the Rule 56] standard compels summary judgment if the non-moving party rests merely upon conclusory allegations, improbable inferences and unsupported speculation." Spiegel v. Leavitt, No. 01-2195, 2005 WL 2402322, at *8 (D.D.C. Sept. 22, 2005).

**B.  Winston's Discrimination Claim Must Fail**

Where, as here, a plaintiff brings discrimination claims with no direct evidence of discrimination, he may avail himself of the burden shifting scheme outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  This Circuit has clarified that in considering an employer's motion for summary judgment "[i]n a Title VII disparate-treatment suit where an employee has suffered an adverse employment action and [the] employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not-and should not-decide whether the plaintiff actually made out a *prima facie* case under *McDonnell Douglas*." *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (affirming summary judgment for the employer).  Instead, the district court should resolve only one question:  "Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race …?"  *Id.*

Here, the Smithsonian has asserted legitimate, non-discriminatory reasons for the challenged action, Winston's 7-day suspension, and there is no evidence that the Smithsonian intentionally discriminated against Winston because of his race.  A plaintiff cannot create a factual issue of pretext based merely on personal speculation of discriminatory intent.  *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) ("a mere unsubstantiated allegation . . . creates no genuine issue of material fact and will not withstand summary judgment").  It is telling that when asked at his deposition for any evidence of discrimination whatsoever, Winston was not able to describe anything – at least nothing apart from what his lawyer told him.  Exh. 9, p. 104:14-23.

A plaintiff without direct evidence can attempt to show discrimination by proving he is situated similarly to a comparator employee outside his protected class.  To do so, he must show all relevant aspects of his employment situation were identical to those of the putative comparator.  *See, e.g., Udoh v. Trade Ctr. Mgmt. Assocs.*, 479 F. Supp. 2d 60, 64 (D.D.C. 2007).  This is impossible for Winston, because his discipline was *sui generis* and thus incapable of comparison to other Smithsonian employees.  Evans discovered Winston's insubordination surrounding the snow removal detail and started disciplinary action, only to have his own supervisor e-mail him about Winston's cell phone abuse about 3 hours later.  Exh. 15, p. 2. Comparators "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Childs-Pierce v. Util. Workers Union of Am.*, 383 F. Supp. 2d 60, 70 (D.D.C. 2005) (quoting *Phillips v. Holladay Prop. Servs.*, 937 F. Supp. 32, 37 (D.D.C. 1996)).

Looking at the cell phone abuse in isolation, four employees besides Winston came to light as heavy cell phone users about a month after Winston's dramatic overage first brought the cell phone issue to the director's attention.  Exh. 40.  This was weeks after Evans had already issued his proposal to suspend.  *Id.*; Exh. 22.  The record does not reveal whether the other employees' use reflected abuse as opposed to legitimate work.  *See* Exh. 40, p. 1 (OFMR's HR liaison asks "is there anyway to verify how many minutes were legitimate work-related calls?"). In Winston's zone, Suitland, the only employee identified besides Winston was David Sidbury. *Id.*  Although Evans did not propose to suspend Sidbury, both "downtown" and Evans warned Sidbury about his cell phone usage.  Exh. 13, p. 3.  Because Sidbury and Winston are of the same race (Exh. 13, p. 2; Am. Compl. ¶ 1), any evidence of Sidbury being treated more favorably than

Winston "could only serve to buttress the defendant's contention that plaintiff's termination was *not* based on his race." *Udoh*, 479 F. Supp. 2d at 67 (considering a proffered comparator within the same protected class as the plaintiff). Furthermore, Sidbury is a lower grade employee than Winston. Winston is a GS-13 building manager and Sidbury is a GS-11 assistant building manager. Exh. 1, p. 1; Exh. 13, p. 1. They are, therefore, not similarly situated: a higher-graded employee may be held to a higher standard. *See*, *e.g.*, Exh. 41, pp. 180:16 - 181:3 (explaining that higher-graded employees are held to a higher standard).

Only one of the identified heavy phone users, John Lagundo, was at Winston's GS level (nobody was above). Exh. 40. The record does not include Lagundo's race. In any event, Lagundo and Winston were not similarly-situated. Lagundo worked in a different zone and thus had a different manager.[6] *Id.* He was also a new employee (*id.*), who may not have been held to the same standards as someone like Winston with 12 years of experience (Am. Compl. ¶ 21). Moreover, in the declaration Winston's counsel prepared for Lagundo's signature, Lagundo made a clarification, writing in that "not all but most [of his] calls were work related." Exh. 42. This is in sharp contrast to Winston, whose "Nextel invoices clearly indicate excessive personal use, with some calls ranging from 50 to 137 minutes." Exh. 21, p. 2; *see also* Exh. 43 (Nextel bills). As the court explained in *Baloch v. Kempthorne*, 550 F.3d 1191, 1200-01 (D.C. Cir. 2008), another employee who did not suffer the same discipline as the plaintiff was not similarly-situated and provided no inference of discrimination "given the sheer number and willfulness of" the plaintiff's infractions. Of course, it is possible Winston would have received a shorter

---

[6] While Lagundo's supervisor may have been more lenient than Evans, when Winston's lawyer asked yet another Smithsonian manager at Evans's level how she would handle a GS-13 employee who misused a cell phone (without mention of other kinds of contemporaneous infractions), she testified she "probably would have suspended" if the employee used 2000 minutes and she saw that they were on personal calls at work. Exh. 16, p. 202:17-22.

suspension or perhaps just a reprimand letter or counseling if his cell phone abuse arose without the simultaneous insubordination issue that Evans had to address.

The courts cannot "second-guess" an employer's personnel decision absent demonstrably discriminatory motive. *Fischbach v. D.C. Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996). Maurice Evans proposed Winston's suspension because Winston failed to see that Evans's snow removal plan was carried out and because Winston used his Smithsonian-issued cell phone excessively. Exh. 22. There is no dispute over whether Winston really used so many phone minutes or whether Evans's snow removal directive was carried out. Exh. 43, pp. 16, 21; ECF No. 7 (Am. Compl. ¶¶ 32, 34). Winston disputes his degree of responsibility for the snow removal staffing. According to him, a lower-level employee, Sidbury, caused the snow removal debacle. Exh. 44, p. 1 ("There is no basis for me to be suspended based on Mr. Sidbury's independent decision to call Mr. Waters in for snow removal"). Winston may argue that because Evans relented and allowed the employee in question to participate in future overtime opportunities, Winston's insubordination was innocuous. *See, e.g.*, Exh. 45.[7] As far as the phone misuse, Winston (a Smithsonian manager earning a 6-figure federal salary) contends he had no way of knowing that making personal calls and using more than 2000 minutes in a month were against the rules since nothing specified a threshold. Exh. 23, p. 4.

The Court should not second-guess the manager in the trenches who must control overtime expenditures. Defendant is entitled to summary judgment if the Smithsonian had a reasonable belief that its reasons for the 7-day suspension were valid, even if it turns out in the course of exhaustive discovery and substantial hindsight they were false. *See Fischbach*, 86 F.3d

---

[7] A declaration – faxed from Winston's lawyer at 12:53 and returned from a Smithsonian building 6 minutes later – states that Waters participated in snow removal before and after the date at issue here. Exh. 45.

at 1183.  The record shows Winston was a constant thorn in Evan's side, undermining his

authority and questioning his every order.  *See*, *e.g.*, Exh. 4, 5, 6.  On the other hand, one of

Winston's coworkers alleged in an affidavit for Winston's administrative case that he:

> ha[d] never experienced a supervisor like Mr. Evans.  He practices favoritism and
> responds too much to hear say.  He doesn't first gain facts from the individual.

Exh. 46, p. 3.  But evidence of general unfairness, without more, does not create a genuine issue

as to discrimination.  *See Fischbach*, 86 F.3d at 1183 ("It is not enough for the plaintiff to show

that a reason given for a job action is not just, or fair, or sensible."); *accord Gómez v. Allegheny*

*Health Services*, 71 F.3d 1079, 1086 (3d Cir. 1995) ("Title VII does not require employers to

treat all employees fairly . . . the law limits its protection against that unfairness to cases of

invidious illegal discrimination.") (internal quotation omitted), *cert. denied*, 518 U.S. 1005

(1996).  Even supposing Evans acted unfairly, on "hearsay," or without a thorough investigation

(there is no evidence of such), summary judgment must enter for Defendant.  There is no basis a

rational fact-finder could suppose Evans acted because of Winston's race.  Indeed, such a

conclusion would be patently illogical considering all the employees involved in the snow

removal incident are of the same race.  Exh. 12, p. 1; Exh. 13, p. 2; Exh. 14, p. 1; Am. Compl. ¶

1.  Washington v. Chao, 577 F.Supp.2d 27, 42 n. 8 (D.D.C.2008); (The fact that the alleged

discriminating official is a member of the same protected class as the plaintiff, weighs against an

inference of discrimination.); Hammond v. Chao, 383 F.Supp.2d 47, 58 n. 1 (D.D.C.2005)

(same); Kelly v. Mills, 677 F.Supp.2d 206, 223-24 (D.D.C. 2010) (same).  As of June 23, 2007,

OFMR had 460 black employees compared to 245 white employees.  Exh. 47.  It is therefore

difficult to craft a logical argument for how Winston could be singled out based on his race.

At this stage in the litigation, Winston has the benefit of exhaustive discovery that

included 8 depositions and hundreds of pages of internal Smithsonian e-mail that contain his

managers' candid impressions.  These include many messages sent from Blackberry handheld devices without much thought – casual observations that would have been "off the record" in an era before e-mail.  *See generally* James M. Rosenbaum, *In Defense of the DELETE Key*, 3 GREEN BAG 2D 393, 393-94 (2000).  Even so, there is no evidence of discriminatory animus on the part of any Smithsonian manager.  This is in contrast to other cases where there were allegations of general enmity toward a plaintiff's protected class and the Court still granted summary judgment for the defendant employer.  *See Houston v. Sectek, Inc.*, 680 F. Supp. 2d 215, 223-24 (D.D.C. 2010) (Roberts, J.) (holding that even if an employer's stated reason for an action was false, evidence of general enmity toward the plaintiff's protected class was insufficient to reasonably infer discrimination was the real reason for the action).

### C.  Winston's Retaliation Claim Must Fail

Just as there is no evidence suggesting discrimination played a role in Winston's suspension, there is no basis for a rational fact-finder to conclude the suspension constituted illegal retaliation against Winston for his unsuccessful EEO complaint a year earlier.  For his retaliation claim to survive summary judgment, Winston must establish a causal link between his suspension in 2007 and his EEO activity in 2006.  *See, e.g., Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007).

One way a plaintiff can raise an inference of retaliation is by showing "very close" temporal proximity.  *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273 (2001).  That is not possible here.  Winston contacted an EEO counselor on April 27, 2006, and he filed his formal discrimination complaint on June 26, 2007.  Am. Compl. ¶¶ 5, 6.  More than 7 months elapsed between the formal complaint and February 7, 2006, when Bechtol forwarded Evans notice of Winston's cell phone abuse.  Exh. 15, p. 2.  More than 9 months elapsed between the

complaint and Bechtol's decision on Evans's April 24, 2007 proposal to suspend.  Am. Compl. ¶ 43.  Courts have held that a gap of even 2 months is too remote to infer any causal connection. *Baker v. Potter*, 294 F.Supp.2d 33, 41 (D.D.C. 2003) (granting the employer's summary judgment motion on retaliation claim, finding 2-month gap between protected activity and adverse employment action insufficient to demonstrate temporal proximity to establish a causal connection); *see also Breeden*, 532 U.S. at 273 (citing with approval circuit opinions holding that 3 or 4-month gaps are too great to support an inference of retaliation); *Nagpal v. Holder*, No. 07-02032, 2010 U.S. Dist. LEXIS 117435, *20-21 (D.D.C. Nov. 4, 2010) (concluding a "four month gap between protected activity and the adverse employment action lacks the temporal proximity necessary to establish a causal connection" in this Circuit).

A causal connection is especially unlikely considering Winston's supervisors in OFMR treated him favorably in the face of multiple opportunities to exercise discretion over him between his EEO complaint and his 7-day suspension.  An employer's failure to retaliate when it had ample opportunity to do so greatly undermines any inference a subsequent action was retaliatory. *See, e.g., Johnson v. Auburn Univ.*, 403 F. Supp. 2d 1101, 1114 (M.D.Ala. 2005), *aff'd*, 193 Fed. Appx. 955 (11th Cir. 2006).  Winston applied, and Nancy Bechtol selected him, for a building manager position within OFMR between the EEO activity and the suspension. Exh. 37; Exh. 29, pp. 172:17-173:10.  During this interval, Winston also received a favorable performance evaluation, a cash award, a time-off award, and Bechtol's approval to travel to an industry conference.  Exhs. 35, p.1; Exh. 38; Exh 36.  All these discretionary and favorable acts undermine any inference that the 7-day suspension was in retaliation for bringing an unsuccessful EEO complaint many months earlier.

Without a close temporal connection, Winston must put forward other evidence of retaliation.  Maurice Evans, the Suitland Zone Manager, decided to impose the discipline at issue in this litigation.  Exh. 22.  Evans had nothing to do with Winston's prior complaint that pertained to actions on the East Mall Zone and involving a different supervisor.  Evans has disclaimed any "first hand knowledge of any EEO activity by Mr. Winston."  Exh. 12, p. 2.  This Court has held that where a supervisor attested he knew "almost nothing about a prior suit or its settlement," there was no basis for a jury to find that retaliation rather than misconduct motivated the measures taken.  *Washington v. Geren*, 675 F. Supp. 2d 26, 35 (D.D.C. 2009); *Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1122 (7th Cir. 2009); *Mulhall v. Ashcroft*, 287 F.3d 543, 551-52 (6th Cir. 2002).  Even if Evans knew every detail of the prior EEO complaint, it is not clear why he would have an incentive to retaliate as a result where the complaint did not implicate or involve Evans in any way.  *See, e.g.,* ECF No. 1 (original complaint); *Vickers v. Powell*, 493 F.3d 186, 195-96 (D.C. Cir. 2007).

Winston will argue that because Nancy Bechtol was the deciding official on Winston's 2006 and 2007 discipline, she was the one retaliating.  Because Evans had already prepared a letter of reprimand on the snow removal tomfoolery before Bechtol had any knowledge of it (*see, e.g.,* Exh. 48), as a logical matter she could only have influenced the severity of the ultimate suspension by passing along information about Winston's phone abuse.  The next level of discipline beyond a reprimand would be a suspension, thus Bechtol could really only influence whether the discipline would be between a 1-day suspension and the 7 days Evans proposed.  In fact, rather than advocating for a harsh penalty as someone with retaliatory animus presumably would, Bechtol demurred: she left it up to HR "to decide whether these actions support 7 days or not," although she did want a suspension "as this guy has to stop defying orders."  Exh. 25.

With over 750 employees in her organization that averages 5 to 10 EEO cases per year (Exh. 49, p. 2), it is not clear Bechtol was aware of Winston's first EEO claim when she forwarded Evans the e-mail discussion of Winston's phone usage or when she decided Evans's proposal to suspend him. It is likely she was never conscious of it, especially considering the stakes were so low (a 1-day suspension she rescinded) and that the case never even proceeded to an investigation. ECF No. 7 at ¶¶ 7,9, 28; ECF No. 21 at 12. The allegations in the EEO complaint also seemed to focus on Samec rather than Bechtol. *See, e.g.,* Exh. 50, p. 1 (Winston e-mail to Bechtol noting that he expected a "formal and sincere" apology from Samec and that Samec's actions "were illegal and violated [his] civil rights"). Moreover, in the course of discovery that included disclosure of each e-mail message related to Winston's discipline and his underlying malfeasance, including many candid messages sent from Bechtol's Blackberry, there is no mention of Winston's prior EEO activity.

Winston will rely on his allegation that Evans told him he "had no friends downtown" to show retaliatory animus.[8] Am. Compl. ¶ 39. This cannot undermine the Smithsonian's proffered justifications for suspending Winston for 7 days. Even if a fact-finder were to believe Evans made the statement, it requires a dramatic leap to infer it is tied to Winston's prior EEO activity. There are a number of reasons Evans might say Winston had no friends downtown. The alleged statement could mean Evans thought Nancy Bechtol was not Winston's friend because of his tendency to be a difficult employee and appeal his supervisor's instructions to her. *See*, *e.g.*, Exh. 4 - 6. There is no retaliatory dimension to this. The statement could mean that Gastright is not his friend after Winston's altercation with her on the Mall, since Gastright is the one who

---

[8] Defendant denies Evans made the statement, and Winston's counsel did not ask Evans about it during his deposition.

discovered and reported Winston's phone abuse.  Truthfully reporting the activity, however, cannot be a retaliatory act.[9]  "Downtown" could also refer to OFMR's business office that manages the cell phone program and is located on the Mall.  *See, e.g.,* Exh. 51, p. 2.  Sidbury appears to have used the term in this way in an affidavit.  Exh. 13, p. 3 ("I was warned first from downtown…").  Considering Evans had limited, if any, knowledge of Winston's EEO activity more than 7 months earlier and considering Bechtol never mentioned Winston's EEO activity in the trove of candid e-mail she exchanged with Evans, just alleging the "friends downtown" comment cannot raise an inference of retaliation.

### D.  Winston Cannot Establish a Hostile Work Environment Claim

#### 1.  Standard for a Hostile Work Environment Claim

The sum of Winston's allegations are that:   (1.) Samec told Winston that Gastright accused him of threatening her with violence (Am. Compl. ¶ 22); (2.) Samec instructed Winston to move to a different museum and stay away from Gastright (Am. Compl. ¶ 23); (3.) Winston was reassigned to Suitland (Am. Compl. ¶ 24), where he faced "decreased responsibility, prestige and importance" (Am. Compl. ¶ 25); (4.) Samec proposed to suspend Winston for 1 day; (5.) Evans proposed unfair discipline for phone abuse and snow removal (Am. Compl. ¶¶ 32-34, 36, 38); and (6.) Bechtol upheld Evans's proposal (Am. Compl. ¶ 43).   Allegations 1 through 4 involve Winston's time on the Mall, and they should no longer be relevant here since he failed to exhaust his administrative remedies with respect to them.  Moreover, these 4 allegations are all part of a single incident, Winston's interaction with a coworker in January 2006.  The fifth and sixth allegations constitute a second discrete event, Winston's suspension for the phone abuse and snow removal staffing.

---

[9] In fact, Gastright could have reported Winston's excessive cell phone use to the Inspector General.  *See, e.g.,* 5 U.S.C. App. 3 § 7(a).

Winston's hostile work environment claim fails because it is based upon the same discrete actions that form the bases of his discrimination claims. The claim fails because the actions upon which it is based – even including the claims from his prior work environment – do not constitute a pattern of severe or pervasive conduct sufficient to establish a hostile work environment. The hostile work environment claim also fails because there is no evidence in the record to suggest that Winston's protected status (*i.e.*, his race, color, or prior EEO activity) motivated the actions upon which it is based.

**2. Winston's Allegations Related to his Experience on the Mall are Time-Barred**

Winston's hostile work environment claim is "sparse" (Dkt. #21, p. 26), merely incorporating by reference all the prior counts of the amended complaint (Am. Compl. ¶ 51). Nevertheless, Winston has only exhausted administrative remedies with respect to a hostile work environment that allegedly existed – by his own account – from February 28, 2007. *See*, *e.g.*, Exh. 52, p. 3 (Winston's lawyer's request for investigation of whether Winston was "subjected to a hostile work environment beginning on February 28, 2007 and/or continuing thereafter"). Plaintiff left the East Mall Zone in Washington, D.C., more than a year before that date to work in Suitland, Maryland. For the purposes of this litigation, the only relevant work environment is Suitland and the only allegedly hostile acts are Evans's proposal to suspend Winston and Bechtol's decision to uphold that proposal.

Even if the Court could interpret Plaintiff's 2007 administrative complaint to have raised a hostile work environment claim reaching back before February 28, 2007, it could not reach back as far as the time Plaintiff worked on the Mall. With respect to discrete acts, a plaintiff can only go back 45 days before his contact with the EEO counselor, thus barring actions before mid-February 2007. Of course, a hostile work environment claim "will not be time barred so

long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002).  But Winston was at Suitland for more than a year before his March 2007 EEO counseling.  Nothing in 2007 at Suitland would be part of any unlawful employment practice that was allegedly occurring in January 2006 on the Mall.

Suitland Zone Manager Evans's decision to suspend Plaintiff for cell phone abuse and failing to follow snow removal instructions is not part of the same allegedly unlawful employment practice as East Mall Zone Manager David Samec proposing to suspend Winston more than a year before for mistreating a colleague.  As the Supreme Court illustrated, if an act on day 401 had no relation to the acts between days 1-100, or for some other reason, such as certain intervening action by the employer, was no longer part of the same hostile environment claim, then the employee cannot recover for the previous acts, at least not by reference to the day 401 act.  *Morgan*, 536 U.S. at 118.  Here, Plaintiff ceased to be part of the same allegedly hostile work environment when the Smithsonian took an intervening action:  the Institution transferred him from the Mall to Maryland.  Completely different employees would have been responsible for any allegedly hostile behavior in Suitland compared to that in Washington.

A court must ask "whether the conduct alleged involved the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers." *Vickers*, 493 F.3d at 199 (quoting *Morgan,* 536 U.S. at 120) (internal quotation marks and citation omitted).  Winston had a different supervisor in Suitland than on the Mall.  Although his second-level supervisor – the one who decided not to suspend him in 2006 – remained the same, she never worked in the same building as Winston and there is no allegation that she took any kind

of frequent actions that could create a hostile work environment.  There is, moreover, no allegation of any hostile or otherwise discriminatory acts between early 2006 and February 2007.

In *Vickers*, the Court concluded the various allegations were not sufficiently different to constitute different hostile work environments, but there the plaintiff remained in the same worksite.  One supervisor retired and the deputy who replaced him allegedly "perpetuat[ed] the environment by condoning the same [hostile conduct]."  493 F.3d at 199.  This Circuit described the management change as a "routine personnel action" that did not constitute "intervening action by the employer" that would sever the earlier incidents from the more recent ones.  *Id.*  Samec did not merely pass the torch on to a deputy who continued to foster a similar work environment for Winston:  Winston moved to an entirely different zone.  The *Vickers* court could "easily imagine circumstances in which a change in managers might affect a hostile work environment claim" (*id.*), and the Second Circuit recently considered such circumstances in dealing with a change of work environment more similar to Winston's.  In *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 78 (2d Cir. 2010), the Court applied *Morgan*'s "relatedness" requirement.  The plaintiff alleged a hostile work environment in one department, but her employer transferred her to a different department in a different section of the same office building.  The court held that her lone post-transfer allegation was not sufficiently related to the allegations about her prior work environment.

The distinction between Winston's work environments is starker than the one in *McGullam*.  He moved miles away to a different state, not just to a different part of the same building.  As in *McGullam*, though, the Smithsonian physically separated Winston from his prior work site and he no longer interacted with the same employees.  *See also Keys v. Wash. Metro. Area Transit Auth.*, 577 F. Supp. 2d 283, 287 (D.D.C. 2008) (excluding evidence of allegations

about conduct spanning various years, supervisors, and work sites "because plaintiff did not show they were part of a single hostile work environment"). Winston does not – and cannot – allege any kind of similar, continuous pattern of hostile behavior extending from the Mall to Maryland.

### 3. Winston's Hostile Work Environment Claim Must Fail Because it Merely Repeats his Disparate Treatment Claims

Regardless of whether Winston can resurrect his gripes from his time on the Mall, the totality of the allegations in the amended complaint do not constitute a viable hostile work environment claim. Winston cannot rely on the discrete acts upon which he bases his discrimination and retaliation claims to support his hostile work environment claim. "Because plaintiff's allegedly hostile events are the very employment actions he claims are retaliatory, he cannot so easily bootstrap alleged retaliatory incidents into a broader hostile work environment claim." *Franklin v. Potter*, 600 F. Supp. 2d 38, 76 (D.D.C. 2009) (internal quotations omitted); *accord Smith v. Jackson*, 539 F. Supp. 2d 116, 138 (D.D.C. 2008). "Cobbling together a number of distinct, disparate acts will not create a hostile work environment, because '[d]iscrete acts constituting discrimination or retaliation claims . . . are different in kind from a hostile work environment claim . . . .'" *Franklin*, 600 F. Supp. 2d at 77, (quoting *Lester v. Natsios*, 290 F. Supp. 2d 11, 33 (D.D.C. 2003)); *accord Wada v. Tomlinson*, 517 F. Supp. 2d 148, 211 (D.D.C. 2007), *aff'd*, 296 F. App'x 77 (D.C. Cir. 2008). Leaving out the Mall allegations for which he failed to exhaust administrative remedies, Winston has not alleged anything apart from Evans's February 2007 proposal to suspend him and Bechtol's subsequent decision on that proposal. Neither the discreet act of a suspension nor one proposed suspension and one actual suspension during about a year is sufficiently severe or pervasive to constitute an actionable hostile work environment.

"If an employee is discriminatorily denied ten promotions over a period of time, that pattern of conduct may give rise to ten separate claims under Title VII, but it would not create a hostile work environment claim based on pervasive intimidation, insult and ridicule." *Diggs v. Potter*, 700 F. Supp. 2d 20, 51 (D.D.C. 2010) (quoting *Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 82 (D.D.C. 2007)).

### 4. Winston's Hostile Work Environment Must Fail Because the Conduct he Alleges is Insufficiently Severe or Pervasive

Whether the Court treats Winston's allegations as two discrete acts (a 2006 transfer plus a 2007 suspension) or unpacks them into an allegedly false allegation, management overreaction, a transfer, a proposed suspension, and accusations about phone use and snow removal staffing, the allegations do not constitute pervasive or severe conduct. A hostile work environment exists only "[w]hen the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quotation marks and citation omitted); *see also Roberson v. Snow*, 404 F. Supp. 2d 79, 97 n. 8 (D.D.C. 2005) (Roberts, J.). The conduct, moreover, "must be extreme to amount to a change in the terms and conditions of employment." *Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998).

Here, there are no allegations of any hostile acts between April 3, 2006 (Am. Compl. ¶ 28 [Bechtol's decision to rescind Samec's proposal to suspend Winston]) and February 28, 2007 (Am. Compl. ¶ 36 [Evans's proposal to suspend]). It is, therefore, difficult to envision a workplace permeated with intimidation, ridicule, or insult. In determining whether a hostile work environment exists, courts must "look at the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an

24

employee's work performance." *Smith v. Jackson*, 539 F. Supp. 2d 116, 137 (D.D.C. 2008) (quotation marks omitted). "Even a few isolated incidents of offensive conduct do not amount to actionable harassment." *Stewart v. Evans*, 275 F. 3d 1126, 1134 (D.C. Cir. 2002).

In *Baloch*, 550 F.3d at 1201, this Circuit affirmed the grant of summary judgment for the defendant employer in a hostile work environment action where the plaintiff alleged significantly more than Winston alleges here. A supervisor allegedly reassigned Baloch's duties and lessened his responsibilities, imposed leave restrictions on him, proposed two separate suspensions, gave him a poor performance review, and engaged in several intense verbal altercations with him. *See id.* at 1195. This circuit nevertheless concluded these "sporadic" conflicts did not constitute "pervasive and constant abuse." *Id.* at 1201; *see also Vickers*, 493 F.3d at 198-201 (affirming the district court's conclusion that three incidents that involved being "singled out for a requirement to provide inordinate amounts of medical information to support requests for leave," poor performance evaluations, supervisor's "angry threats," and derogatory comments about minorities did not create a hostile work environment); *George v. Leavitt*, 407 F.3d 405, 416-17 (D.C. Cir. 2005) (holding that statements by three employees over a six-month period telling the plaintiff to "go back where she came from," separate acts of yelling and hostility, and allegations that the plaintiff was not given the type of work she deserved were isolated instances that did not rise to the level of severity necessary to find a hostile work environment); *Franklin*, 600 F. Supp. 2d at 77 ("the fact that an employee and his immediate supervisor repeatedly butted heads, that the supervisor frequently yelled at [the plaintiff] during discussions about . . . work, and that the supervisor threatened him with job-related consequences for his refusals to meet workplace expectations does not demonstrate a hostile work environment pervaded by discrimination").

Winston apparently alleges several different employees made 2 or 3 unwarranted accusations about Winston's conduct over a period of about 15 months. The small quantity of allegations alone should doom his hostile work environment claim. In *Morgan v. Vilsack*, 715 F. Supp. 2d 168, 184 (D.D.C. 2010), the court found that "ten events, spread over a period of three years, simply cannot be found to be so objectively hostile, especially in light of other cases with less frequency of allegedly discriminatory conduct," citing *Akonji v. Unity Healthcare, Inc.*, 517 F. Supp. 2d 83, 98 (D.D.C. 2007), where the court found that 5 discreet acts over a 2-year period were insufficient to state a claim for hostile work environment discrimination. In *Akonji*, where the court granted the employer's summary judgment motion, four of the five alleged acts occurred within three months of each other, and the fifth occurred more than a year later. 517 F. Supp. 2d at 98. The court reasoned these incidents were "isolated" and "not sufficiently continuous and concerted to be deemed pervasive." *Id.* (internal quotations omitted). No matter how Winston may count, his allegations are no more pervasive than the plaintiff's allegations in *Akonji* or *Morgan*.

### 5. Even if Winston had Alleged Severe and Pervasive Acts, his Claims Would Still Fail Because He Cannot Attribute them to his Protected Status

Regardless of the severity and pervasiveness of Winston's allegations, to sustain a hostile work environment claim he must still show that he was discriminated against because of a protected status. *See, e.g., Roberson*, 404 F. Supp. 2d at 97. Here, none of the alleged acts are related to Winston's race or prior EEO activity, and "[i]ncidents unrelated to the plaintiff's race cannot be used to support a hostile work environment claim." *Id.*, citing *Kelley v. Billington*, 370 F. Supp. 2d 151, 158 (D.D.C. 2005); *accord Baloch*, 550 F.3d at 1201 (affirming dismissal of a hostile work environment claim where none of the alleged hostile acts were expressly focused on the plaintiff's protected status); *Na'Im v. Clinton*, 626 F. Supp. 2d 63, 73 (D.D.C. 2009) ("hostile

behavior, no matter how unjustified or egregious, cannot support a claim of hostile work environment unless there exists some linkage between the hostile behavior and the plaintiff's membership in a protected class" [citations omitted]).  *Kline v. Springer*, 602 F. Supp. 2d 234, 243 (D.D.C. 2009) (finding plaintiff's hostile work environment allegations were not corroborated by any direct or circumstantial evidence that would show impermissible motive or discriminatory animus).  Here, Winston can produce nothing beyond his own speculation to suggest any of the allegedly hostile acts were motivated by illegal discrimination or retaliation.

## IV.  Conclusion

For all these reasons, summary judgment should be entered in favor of Defendant.

Respectfully submitted,

RONALD C. MACHEN, JR.
D.C. Bar #447889
United States Attorney
for the District of Columbia

RUDOLPH CONTRERAS
D.C. Bar #434122
Chief, Civil Division


_____/s/_____
ALEXANDER D. SHOAIBI
OF COUNSEL:                        D.C. Bar #423587
Daniel J. Paisley                 Assistant United States Attorney
Assistant General Counsel         555 Fourth Street, N.W.
Smithsonian Institution           Washington, D.C. 20530
                                  (202) 514-7236
                                  Alexander.d.shoaibi@usadoj.gov